**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 27, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

IVAN A. SILVA-ARZETA, a/k/a Ivan
Selva, a/k/a Tony Arellano Cebrero,

Defendant - Appellant.

No. 07-5140

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 4:06-cr-00120-TCK-1)**

---

William D. Lunn, Tulsa, Oklahoma, for Defendant - Appellant.

Leena Alam, Assistant United States Attorney, (David E. O'Meilia, United States
Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff - Appellee.

---

Before **BRISCOE**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.[*]

---

**HARTZ**, Circuit Judge.

---

[*]The Honorable Stephanie K. Seymour was assigned to this panel originally
and heard argument on June 16, 2008. She later recused herself, however, and the
Honorable Mary Beck Briscoe was substituted on the panel.

A jury convicted Ivan Silva-Arzeta of possession of methamphetamine with intent to distribute, *see* 21 U.S.C. § 841, possession of a firearm in furtherance of a drug-trafficking offense, *see* 18 U.S.C. § 924(c), and possession of a firearm by an illegal alien, *see* 18 U.S.C. § 922(g)(5). On appeal he contends (1) that he did not give valid consent to the search of his apartment that yielded drugs and a firearm; (2) that his right to due process was violated when a police officer questioned him in Spanish without using an interpreter; and (3) that he was entitled to discovery regarding alleged evidence tampering between his first trial (which ended in a mistrial) and the trial at which he was convicted. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.    BACKGROUND

Although we will later have occasion to note Mr. Silva-Arzeta's version of some events, we begin by summarizing the evidence in the light most favorable to the district court's ruling on the consent issue. *See United States v. Apperson*, 441 F.3d 1162, 1184 (10th Cir. 2006) (appellate court reviews evidence regarding consent in light most favorable to lower court's ruling). On May 31, 2006, Tulsa Police Officer William Mackenzie was conducting surveillance at an apartment complex as part of a gang-related investigation. He saw a series of persons make brief visits to one of the apartments (not the one that he was there to observe) in a manner he associated with drug sales. He saw Mr. Silva-Arzeta leave the apartment, drive away, and return after a short time, using a key to re-enter.

Mr. Silva-Arzeta then left the apartment and drove away a second time. He was not wearing a seatbelt. Mackenzie contacted Officers Joshua Martin and David Brice, who were in a marked police vehicle near the apartment complex. He described the car and asked them to conduct a traffic stop. When Mr. Silva-Arzeta drove past, the officers stopped him. Martin had observed that Mr. Silva-Arzeta was not wearing a seatbelt.

Martin approached Mr. Silva-Arzeta's car and, speaking English, gave the reason for the stop and asked to see Mr. Silva-Arzeta's driver's license and proof of insurance. Mr. Silva-Arzeta answered in English that he had no license. Although Mr. Silva-Arzeta spoke with an accent, Martin had no trouble understanding him. Martin ordered him to exit the car and told him that he was under arrest for driving without a license. Mr. Silva-Arzeta complied with the order, giving no indication that he did not understand. Martin handcuffed him. Brice conducted an inventory search of the car and found a small quantity of methamphetamine in a plastic baggie inside a chewing-gum package. Martin searched Mr. Silva-Arzeta's person incident to his arrest and found $1,038 in cash in one of his pockets.

Mackenzie arrived at the scene as Brice was searching the car. Mackenzie confirmed with Martin, who was standing with Mr. Silva-Arzeta, that the latter spoke English. Mackenzie then asked Mr. Silva-Arzeta whether he was willing to talk. Mr. Silva-Arzeta said, "Yes," R., Vol. III at 10, and Mackenzie gave him a

*Miranda* warning in English. When asked whether he understood, Mr. Silva-Arzeta responded that he did.  Mackenzie noted that Mr. Silva-Arzeta's English was accented and thought that he probably spoke Spanish.  Mackenzie asked Mr. Silva-Arzeta whether the methamphetamine found by Brice belonged to him; he answered, "Yes."  *Id.*, Vol. XIII at 114.  But he answered, "No," when Mackenzie asked whether he had any methamphetamine at his apartment.  *Id.* at 114.  Mackenzie then asked whether he could search the apartment, and Mr. Silva-Arzeta responded, "Yeah."  *Id.*, Vol. III at 11.  Mackenzie does not speak Spanish and did not attempt to converse with Mr. Silva-Arzeta in Spanish at any point.

Mackenzie, Martin, and Brice, now joined by an additional officer, took Mr. Silva-Arzeta back to the apartment complex.  Mackenzie led him to the apartment that he had seen him enter and leave earlier and asked in English whether it was his.  Mr. Silva-Arzeta responded "Yeah," *id.* at 12, and said that there was no one inside.  After knocking, Mackenzie asked whether he could use Mr. Silva-Arzeta's key, which the officers had seized at the traffic stop, to open the door.  Mr. Silva-Arzeta again answered affirmatively, and the officers entered, bringing him inside with them.  The officers' search yielded two scales, a semiautomatic pistol and ammunition, 261.2 grams of methamphetamine, two packages containing plastic baggies, $4,820 in cash, and false identity documents.

After the search the officers took Mr. Silva-Arzeta to a police substation. Mackenzie contacted Detective Frank Khalil, who had been certified by a local company as a Spanish-language speaker, and asked him to interview Mr. Silva-Arzeta in Spanish. Although Mr. Silva-Arzeta had conversed with the officers in English, Mackenzie thought that he would be more comfortable and provide more useful information if he were interviewed in Spanish. Khalil joined Mr. Silva-Arzeta in a room at the substation and, speaking in English, introduced himself as a Spanish-speaking officer and asked whether Mr. Silva-Arzeta knew why he had been arrested. He answered in English that his arrest had to do with the drugs found in his car and apartment. Khalil then read Mr. Silva-Arzeta a Spanish-language waiver of rights, which Mr. Silva-Arzeta signed. During the following interview both men spoke in Spanish. In response to Khalil's questions, Mr. Silva-Arzeta said that he had been in the United States for about a year and had lived in the apartment for about a month. He said that he had bought methamphetamine for resale twice, both times from a source named Ricardo, and most recently had bought seven or eight ounces for about $400 an ounce. He explained that he resold the methamphetamine in "20s," or half-gram packets. R., Vol. III at 45. Mr. Silva-Arzeta also told Khalil that the money seized from his apartment was from drug sales and that he had bought the handgun at a gun show. Khalil's interview with Mr. Silva-Arzeta was not recorded, nor did Mr. Silva-Arzeta make or sign a written statement.

A superseding indictment charged Mr. Silva-Arzeta with possession of 50 grams or more of methamphetamine with intent to distribute, *see* 21 U.S.C. § 841; possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c); and possession of a firearm by an alien unlawfully in the United States, *see id.* §§ 922(g)(5).[1] (The first count was later changed to a reduced charge of possession with intent to distribute 50 grams or more of a mixture containing a detectable amount of methamphetamine.) The first jury to hear Mr. Silva-Arzeta's case failed to reach a verdict on any of the three counts. A second jury convicted him on all three.

## II.    DISCUSSION

### A.    Validity of Consent to Search

Before trial Mr. Silva-Arzeta sought to suppress the methamphetamine, firearm, and ammunition found in the apartment. The district court denied the motion after holding an evidentiary hearing. Mr. Silva-Arzeta contends that the court erred in finding that he had validly consented to the apartment search. He

---

[1] The superseding indictment also charged Mr. Silva-Arzeta with three offenses based on documents found in his apartment: use of a false Social Security number, *see* 42 U.S.C. § 408(a)(7)(B); possession of false identification documents (a Social Security card and a resident-alien card) with intent to defraud the United States, *see* 18 U.S.C. § 1028(a)(4); and possession of a counterfeit immigration-identification document, *see id.* § 1546(a). He pleaded guilty to these three charges. He does not raise on appeal any issue relating to these convictions; accordingly, we do not discuss them further.

complains that his consent was ineffective because he could not understand English and because it was coerced. We are not persuaded.

At the evidentiary hearing, Officers Mackenzie, Martin, and Khalil testified that they had spoken English to Mr. Silva-Arzeta and that he had answered them in English. Mr. Silva-Arzeta denied that he had conversed with any of the officers in English or that he had understood anything that they had said to him in English (save for the word *license*, which is similar in Spanish). In particular, he said that he did not understand the request to search the apartment. As for his conversation in Spanish with Khalil, he said that he did not recall making various statements that Khalil reported him to have made. And he specifically denied telling Khalil that he had bought methamphetamine for resale, that he had sold "20s" of the drug, that the cash seized at the apartment was drug-sale proceeds, or that he had bought the gun at a gun show. Mr. Silva-Arzeta's former employer, Mark Fairbairn, also testified to Mr. Silva-Arzeta's limited ability to speak and understand English. Fairbairn said that he often communicated with Mr. Silva-Arzeta through a bilingual employee, but conceded that these exchanges were mostly technical ones about the operation of machinery.

The court denied the motion to suppress in a written order. It concluded that Mr. Silva-Arzeta had given the officers valid consent to search the apartment and

specifically [found] that Silva spoke and understood English well enough to give his consent. . . . Silva's claim that a language barrier prevent[ed] him from voluntarily consenting is not preclusive where the evidence demonstrates that he had a working knowledge of the English language. A working knowledge exists if the individual has sufficient familiarity with the English language to understand and respond to the officer's questions. Silva's claim that he neither spoke nor understood any English is simply not credible.

R., Vol. I Doc. 22 at 6–7 (citations and internal quotation marks omitted). The court also determined that although Mr. Silva-Arzeta was handcuffed when he was asked for consent to search the apartment, there was no evidence that he was intimidated or harassed in such a way as to render his consent involuntary.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment." *Apperson*, 441 F.3d at 1184 (internal quotation marks omitted). Under the Fourth Amendment, "a search conducted without a warrant issued upon probable cause is per se unreasonable[,] subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and ellipsis omitted). "[O]ne of the specifically established exceptions . . . is a search that is conducted pursuant to consent." *Id.* "Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances

and reviewed for clear error." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001).

Mr. Silva-Arzeta's principal argument on appeal is that his alleged consent could not have been valid because he did not understand English well enough. He contends that the evidence overwhelmingly showed that he was unable to understand "all but the most rudimentary English terms" and thus "lacked the understanding and judgment required to give valid consent." Aplt. Br. at 22 (internal quotation marks omitted). Relying heavily on Fairbairn's testimony, Mr. Silva-Arzeta makes good arguments that he could not have understood the officer's request for consent. But such arguments are for the trier of fact, not this court. The district court could properly believe the internally consistent testimony of the officers. *See United States v. Burson*, 531 F.3d 1254, 1259 n.4 (10th Cir. 2008) (appeals court defers to trial court's credibility determinations). Its finding that Mr. Silva-Arzeta understood English sufficiently well to give consent was not clearly erroneous.

Mr. Silva-Arzeta points to our decisions in *United States v. Rodriguez*, 525 F.2d 1313 (10th Cir. 1975), and *United States v. Benitez-Arreguin*, 973 F.2d 823 (10th Cir. 1992), saying that these cases "invalidated searches based on consents . . . given by Hispanics who did not comprehend what they were doing." Aplt. Br. at 28. In neither case, however, did we overturn a district court's finding regarding the defendant's ability to understand English. They are therefore

irrelevant to the issue before us.  We affirm the district court's ruling that

Mr. Silva-Arzeta could converse in English sufficiently well to consent to the

search.[2]

Mr. Silva-Arzeta also contends that the district court erred in concluding

that his consent to the apartment search was voluntary.  "Voluntariness is a

question of fact to be determined by the totality of circumstances, and we cannot

overturn the district court's findings of fact unless they are clearly erroneous."

*United States v. Dozal*, 173 F.3d 787, 795 (10th Cir. 1999) (citations and internal

quotation marks omitted).  "The central question is whether a reasonable person

would believe he was free to . . . disregard the officer's request."  *United States v.*

*Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (internal quotation marks

omitted).  "The proper inquiry centers on whether the defendant suffered, inter

alia, physical mistreatment, use of violence or threats of violence, promises or

inducements, deception or trickery."  *Dozal*, 173 F.3d at 796 (internal quotation

marks omitted).  The district court addressed these issues and found that

> although Silva was in handcuffs and therefore detained, this fact
> alone does not render Silva's consent involuntary.  Other officers
> were present when Silva consented, but there is no evidence that the
> officers used any violence, threats, promises, trickery, or other forms
> of intimidation or deception that would render Silva's consent

---

[2]Mr. Silva-Arzeta also argues that testimony at trial supports him on this point.  But we will not review trial evidence to overturn a pretrial denial of a motion to suppress unless the motion was renewed at trial.  *See United States v. Parra*, 2 F.3d 1058, 1065 (10th Cir. 1993).

involuntary. Silva's consent was specific and unequivocal, as well as freely and intelligently given.

R., Vol. I Doc. 22 at 7–8 (citation omitted).

Those findings are not clearly erroneous. We consider the circumstances when Mr. Silva-Arzeta gave his consent, shortly after his arrest several blocks from his apartment. (Mr. Silva-Arzeta's brief incorrectly focuses on what he terms "the coercive atmosphere on the front porch of [his] apartment as the officers initiated their entry," Aplt. Br. at 28.) Several factors reduced the possibility of intimidation. The scene was a public street. *See United States v. Soto*, 988 F.2d 1548, 1558 (10th Cir. 1993) (upholding a voluntariness finding in part because officer asked for consent to search "on the shoulder of an interstate highway, in public view"). Mackenzie gave Mr. Silva-Arzeta a *Miranda* warning before requesting consent. *See United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) ("Whether an officer reads a defendant his *Miranda* rights . . . [is a] factor[] to consider in determining whether consent given was voluntary . . . ."). There is no evidence that any officer's service weapon was unholstered at any point. *See United States v. Kimoana*, 383 F.3d 1215, 1226 (10th Cir. 2004) (following case law finding consent to be voluntary when guns were holstered before request to search). Nor is there any evidence that Mackenzie used an aggressive or insisting tone or that he conveyed in any way to Mr. Silva-Arzeta that he was obligated to allow the search. *See Ledesma*, 447 F.3d at 1314.

Mr. Silva-Arzeta points to the number of officers present at the traffic stop when he gave consent to the search. But Officer Martin was 10 to 15 feet away, preparing a tow-in slip for Mr. Silva-Arzeta's car, while Mackenzie was questioning him and requesting consent. And Officer Brice was apparently also involved in conducting an inventory search of Mr. Silva-Arzeta's car during Mackenzie's conversation with Mr. Silva-Arzeta. The presence of Martin and Brice therefore was unlikely to have produced much of a coercive effect on Mr. Silva-Arzeta. *Cf. United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006) (presence of several officers not dispositive). Mr. Silva-Arzeta also argues that he was coerced because the officers were holding his key. But the officers' retention of his key added no coercion beyond that inherent in his arrest. Once he was under arrest, he had no immediate use for his key. To be sure, we have considered an officer's retention of a person's property as relevant in determining whether the person has been involuntarily detained, as when an officer does not return license and registration documents to a driver after a traffic stop. *See United States v. Villegas*, 554 F.3d 894, 898 (10th Cir. 2009). In this case, however, there is no dispute that Mr. Silva-Arzeta was being involuntarily detained when he gave consent.

Thus, the basis of Mr. Silva-Arzeta's claim of coercion amounts to simply his being arrested and handcuffed. We recognize that arresting and handcuffing are coercive acts. But the consent of a handcuffed arrestee may well be

-12-

voluntary. *See Dozal*, 173 F.3d at 796 ("Supreme Court and Tenth Circuit precedent establishes that consent to search may be voluntary even though the consenting party is being detained at the time consent is given." (brackets and internal quotation marks omitted)); *Carpenter v. United States*, 463 F.2d 397, 401 (10th Cir. 1972) (consent voluntary after being arrested and handcuffed); *United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) (voluntary consent by defendant who had been handcuffed for 20 minutes). We affirm the district court's ruling that Mr. Silva-Arzeta's consent to the search was valid.

**B.      Admission of Officer Khalil's Testimony**

Before his second trial Mr. Silva-Arzeta filed a motion in limine seeking to preclude Khalil from testifying "as an expert interpreter" about the incriminating statements made by Mr. Silva-Arzeta in Spanish during questioning by Khalil. R., Vol. I Doc. 78 at 1. Mr. Silva-Arzeta questioned the bona fides of Khalil's certification in Spanish, Khalil's formal training in Spanish, and his ability to converse in the language. He also argued that Khalil's role as an investigating officer made him a biased interpreter and that his failure to record or memorialize Mr. Silva-Arzeta's incriminating statements cast further doubt on his testimony. After a hearing the district court denied the motion to exclude Khalil's testimony, although the court never had to resolve whether Khalil had the credentials requisite for an expert because the government did not offer him as an "expert" witness.

-13-

On appeal Mr. Silva-Arzeta recasts his argument, contending that Khalil's interrogation violated his right to due process and that his statements to Khalil were therefore inadmissible at trial. He complains that Khalil was not properly certified as an interpreter, that Khalil's status as a law-enforcement officer should have precluded him from acting as an interpreter for a police interrogation, and that the failure to record the interrogation prevents verification of his incriminating statements. We reject the argument.

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice." *United States v. Solomon*, 399 F.3d 1231, 1240 (10th Cir. 2005) (internal quotation marks omitted) (rejecting claim that defendant was denied due process by allegedly erroneous rulings on evidence); *see also United States v. McHorse*, 179 F.3d 889, 896 (10th Cir. 1999) (admission of evidence under Fed. R. Evid. 414(a) "was not so prejudicial as to violate the due process protections of the Fifth Amendment"). What Mr. Silva-Arzeta sees as unfair in the admission of Khalil's testimony is, in essence, that Khalil may have reported the conversation incorrectly because of his lack of understanding of Spanish or his bias as a police officer, and that the failure to record or memorialize the conversation impaired Mr. Silva-Arzeta's ability to correct Khalil's errors.

Mr. Silva-Arzeta's concerns, however, are the bread and butter of litigation. Much of the controversy at trials could be minimized, if not eliminated, if all acts

were videotaped and all conversations recorded. Mr. Silva-Arzeta's complaints derive from an alleged problem with interpreting Spanish; but assertions that an officer misinterpreted a defendant's words arise often enough when all participants are speaking English. Although there may be inaccuracies in Khalil's testimony, cross-examination and presentation of contrary evidence (such as Mr. Silva-Arzeta's own testimony) are what we rely on to assess the truth. Due process might require a witness to have a threshold capacity to understand Spanish before the witness is permitted to testify about a conversation in that language; but we see no ground to reject the district court's determination that Khalil had sufficient knowledge of Spanish to testify.

Mr. Silva-Arzeta cites three authorities—a Justice Department policy-guidance document and two court decisions—that he contends support a due-process standard for custodial interrogations of persons with limited English proficiency. But none of these authorities purports to set a constitutional standard. Although they suggest what "best practice" may be, due process does not require so much.

The Justice Department's guidance recommends that certified interpreters other than police officers be used in custodial interrogations, and that the interrogation be recorded if conducted by an officer. The document makes clear, however, that it "is not a regulation but rather a guide." Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National

Origin Discrimination Affecting Limited English Proficient [LEP] Persons, 67 Fed. Reg. 41,455, 41,457 n.2 (June 18, 2002); *see also id.* at 41,469 ("[I]n formulating a plan for effectively communicating with LEP individuals, agencies *should strongly consider* whether qualified independent interpreters would be more appropriate during custodial interrogations than law enforcement personnel themselves." (emphasis added)).

The first judicial opinion that Mr. Silva-Arzeta relies on is the Ninth Circuit decision in *United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991). He points to the following language:

> Where translation is needed in the course of an open investigation or interrogation following arrest, there is no reason why the interview cannot be recorded and/or the translation cannot be conducted by a certified translator who can be available to testify at trial.

*Id.* at 527 n.7. But the court made this comment in the course of observing that certified translators and recordings ordinarily could not be employed in undercover investigations, which was the situation in that case. *See id.* The issue before the court was whether statements made by an interpreter, who was translating the defendant's statements in a drug transaction, should be considered to be statements by the defendant herself for purposes of the hearsay rule and Confrontation Clause. The opinion makes no mention of due process, which is the issue before us.

-16-

The other judicial opinion is *Rivera v. Granucci*, No. N-87-480, 1993 WL 76202 (D. Conn. Mar. 12, 1993). Mr. Silva-Arzeta quotes the following passage: "[A] defendant who does not speak English surely has a right to foreign-language interpretation in court proceedings, during police interrogations, and in any situation involving the waiver of his rights." *Id.* at *8. This statement, however, was dictum. The claim of the defendant was that he should have been informed of the charges against him "in Spanish either directly or through an interpreter." *Id.* The court's holding was that the defendant was not entitled to have an interpreter inform him in Spanish of the reason for his arrest, because a defendant has no constitutional right to be informed of the reason for his arrest in *any* language. In context the court's quoted comment is stating no more than that a person who cannot speak English has a right to be questioned in a language that he does speak.

We can agree with Mr. Silva-Arzeta that the use of certified interpreters and recording devices during interrogation could improve the accuracy of evidence at trial. We cannot, however, hold that their use is constitutionally required.

## C. Alleged Tampering with Evidence/Request to Examine Jurors

The charge against Mr. Silva-Arzeta of possession of methamphetamine with intent to distribute was based on the discovery of 261.1 grams of the drug during the search of his apartment. The methamphetamine was found in a drawer

of a dresser in the apartment's living room. Mr. Silva-Arzeta suggested at trial that the methamphetamine was not his but belonged to his roommate. As part of its effort to prove otherwise, the prosecution compared some empty baggies found in the apartment to the pink plastic baggie containing methamphetamine that was found in Mr. Silva-Arzeta's car. During the search of the apartment, officers had found two packages of plastic baggies (marked as Exhibit 5), one with purple baggies and one with pink baggies, in the same dresser drawer as the methamphetamine. Mackenzie testified that traffickers commonly sell methamphetamine and other drugs in such baggies to users for various prices, depending on the size of the baggie. He further testified at the first trial that the pink baggies found in the apartment matched the pink baggie taken from the car.

Shortly before jury selection at Mr. Silva-Arzeta's second trial, his counsel examined Exhibit 5. Counsel discovered that Exhibit 5 contained pink baggies of two sizes, and that the larger size matched the size of the pink baggie from the car. He raised the matter with the district court, expressing surprise at the discovery because he recalled that at the first trial the pink baggies in the exhibit did not match the pink baggie found in Mr. Silva-Arzeta's car. He said that during his closing argument at the trial he had even taken pink baggies out of the exhibit and showed the jury that they were not the same size as the baggie from the car. He suggested that someone had tampered with the evidence between the two trials. But he requested no relief, saying only: "One of my reactions would

-18-

be if you actually had some of the jurors who—in the first trial that might have seen the evidence and whether they might have compared those baggies and what they remember. That might be an issue." R., Supp. Vol. I at 35.

During the second trial Mr. Silva-Arzeta questioned Mackenzie about the chain of custody of the baggies between the two trials, although no question suggested that there had been tampering. The court denied the challenge to the chain of custody, and Mackenzie testified that the baggie found in Mr. Silva-Arzeta's car matched some of the baggies in Exhibit 5.

After trial Mr. Silva-Arzeta moved to examine the jurors from both trials, indicating that this examination could ground a motion for a new trial on the basis of newly discovered evidence. In support, his counsel reiterated his suspicions of evidence-tampering, but he mentioned no evidence of tampering beyond what he had pointed to at the outset of the second trial. He argued that

> the only realistic way of resolving whether the Government's Exhibit 5 . . . was augmented with additional pink baggies is to ask the jurors from the first trial whether Government's Exhibit 5 in the second trial appears to be the same, or different. If the first panel of jurors during their deliberations actually took out the pink baggies in response to defense counsel's argument and found that none matched the pink baggie found in . . . the Defendant's car, then the jurors from the first panel could be quite emphatic that the pink baggies contained in Government's Exhibit 5 in the second trial do not match.

*Id.* Vol. I Doc. 92 at 8. The district court denied the request. Applying the standard set forth in *United States v. Velarde*, 485 F.3d 553 (10th Cir. 2007), for

-19-

postverdict discovery to support a motion for a new trial based on newly discovered evidence, it said that Mr. Silva-Arzeta had not shown that "'further investigation under the court's subpoena power very likely would lead to the discovery of' evidence sufficient to support a motion for a new trial or, at least, a motion for evidentiary hearing on a new trial." R., Vol. I Doc. 101 at 14 (quoting *Velarde*, 485 F.3d at 560 (brackets and emphasis omitted)).

Mr. Silva-Arzeta appeals the denial of his motion. We affirm the district court, but without reference to the *Velarde* standard. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("We can affirm on a ground not relied upon by the district court if the record requires affirmance on that ground and it is not unfair to the appellant to rely on that ground."). As the district court noted in its order denying the motion, the government had argued that the discovery sought by Mr. Silva-Arzeta could not generate newly discovered evidence because he had known the facts underlying his motion even before the jury was empaneled for his second trial. We agree with that argument. A defendant requesting a new trial based on newly discovered evidence must have been diligent in seeking the evidence before the verdict was rendered. *See United States v. Herrera*, 481 F.3d 1266, 1270 (10th Cir. 2007) ("[T]o prevail on a motion for a new trial based on newly discovered evidence, [a defendant] must show [among other things] that . . . the failure to learn of the evidence was not caused by his own lack of diligence." (internal quotation marks omitted)); *United*

-20-

*States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997) (defendant not entitled to new trial; he could reasonably have anticipated relevance of, and sought before trial, school attendance records showing that a government witness had been absent on a critical date); *United States v. Robinson*, 585 F.2d 274, 278 (7th Cir. 1978) (en banc) (new-trial motion properly denied; defendant "must establish that the material asserted to be newly discovered could not have been discovered with due diligence before or during trial"; defendant did not request continuance during trial to examine gun at issue); *cf. United States v. Diaz-Albertini*, 772 F.2d 654, 657 (10th Cir. 1985) ("[W]hen a litigant is aware of alleged juror misconduct during trial it is ineffective to raise the issue for the first time after trial. . . . The litigant cannot transform a tactical decision to withhold the information from the court's attention into a trump card to be played only if it becomes expedient.").

The time for Mr. Silva-Arzeta to seek evidence regarding tampering was before the verdict was rendered. He did not have the option of awaiting the verdict to determine whether to pursue his inquiry. He could have moved at trial for a continuance, subpoenaed former jurors, or taken other steps to investigate tampering. It is not uncommon for a court to conduct an investigation during trial to determine whether there have been improper communications with jurors. *See, e.g.*, *United States v. Barrett*, 496 F.3d 1079, 1101–02 (10th Cir. 2007). There is no reason why a similar inquiry into evidence tampering could not have been conducted when Mr. Silva-Arzeta's counsel first raised his concerns. He had no

-21-

additional evidence of tampering when he made his posttrial motion. It is therefore obvious that any evidence he might have acquired after a grant of his posttrial motion could have been obtained before the verdict if he had acted diligently. In other words, no evidence acquired by granting the motion could be considered "newly discovered," so granting the motion would be a useless act.

The district court expressed concern that Mr. Silva-Arzeta should not be penalized for voicing his suspicions before and during trial. The problem for Mr. Silva-Arzeta, however, is not that he voiced suspicions, but that he knew during trial all the facts upon which his posttrial motion was based, yet did not diligently pursue the matter. All he did during trial was question Mackenzie regarding the chain of custody of Exhibit 5; he did not even specifically question him about possible tampering and the size of the baggies. He contends that he sought discovery during trial, but we disagree. After suggesting that Exhibit 5 had been altered, all that defense counsel said was: "One of my reactions would be if you actually had some of the jurors who—in the first trial that might have seen the evidence and whether they might have compared those baggies and what they remember. That might be an issue." R., Supp. Vol. I at 35. This was too tentative and oblique to constitute a request for discovery. Accordingly, we affirm the denial of Mr. Silva-Arzeta's motion to examine jurors.

III. CONCLUSION

We AFFIRM the judgment of the district court.

07-5140, *United States v. Silva-Arzeta*

**HOLLOWAY**, J., dissenting:

# I

The majority opinion is certainly well-reasoned. I cannot disagree with any part of it. Extraordinary circumstances nevertheless lead me to conclude that I cannot join the opinion, nor can I concur in the judgment. Instead, I feel compelled to dissent. As I will discuss, the investigation of this matter involved many deficiencies in law enforcement practices. None of them individually is so significant as to rise to the level of a violation of Mr. Silva-Arzeta's fundamental rights. Frankly, even in combination these departures from good police practice might not be enough to lead to the conclusion that the convictions should be reversed, even though in combination they are very, very troubling. But this case unfortunately involves much more than mere failure to follow good police practices.

Extraordinary circumstances have convinced me that I cannot in good conscience assent to affirm the judgment of the district court. These circumstances concern the trial exhibits, especially Exhibit 5, which the court's opinion addresses in Part II-C. Exhibit 5 must be regarded as crucial evidence in this case. As the majority opinion points out, defense counsel used this exhibit in a demonstration before the jury in Mr. Silva-Arzeta's first trial, showing the jurors that the baggies in the exhibit did not match the baggie found in Mr. Silva-Arzeta's car. By showing the jurors in the first trial that the baggie found in his

client's car was of a different size, defense counsel was able to call into question the inference that the baggies connected Mr. Silva-Arzeta to the methamphetamine found in the apartment.

The connection concerning the baggies was critical to the prosecution's case because Mr. Silva-Arzeta was charged with possession with intent to distribute, and the prosecution did not contend that the small amount of methamphetamine found in the car – methamphetamine that Mr. Silva-Arzeta admitted was his – was sufficient to support an inference of intent to distribute. When defense counsel examined Exhibit 5 just prior to commencement of the second trial, he realized that he would not be able to make the same argument to the second jury if the exhibit were to be admitted, because there were now many baggies in the exhibit matching the one that had been found in Mr. Silva-Arzeta's car. It was at that point that counsel raised the serious possibility that there had been tampering with the evidence.

The majority opinion notes that counsel for Mr. Silva-Arzeta challenged the chain of custody at trial after questioning Officer Mackenzie about it. But the majority does not fully explain the exceptional circumstances underlying the chain of custody. The chain of custody issue was not an issue which Mr. Silva-

Arzeta directly raised on appeal, but I would find there was plain error requiring reversal of the convictions.[1]

At the conclusion of the first trial, we are told, the parties were informed that they would be responsible for their exhibits. At the second trial, counsel for Mr. Silva-Arzeta was concerned about the exhibits, as recited in the court's opinion. When Exhibit 5 was offered in evidence, defense counsel requested and was granted an opportunity to voir dire Officer Mackenzie about the chain of custody. Officer Mackenzie testified that the night before trial he had received a box containing all of the prosecution's exhibits from ATF agent Brandon McFadden, who was unavailable to testify at this trial for reasons that were unexplored other than Officer Mackenzie's explanation that Agent McFadden was "on another case" which "has taken all his time . . . ." Officer Mackenzie then put that box of exhibits in his vehicle, which was parked in the driveway of his residence overnight. That is, in itself, most unusual.

But about two months had passed since the conclusion of the first trial. Where was the box of exhibits during that time? Officer Mackenzie did not know. And that is the totality of the chain of custody testimony regarding the prosecution's exhibits.

---

[1]In his reply brief Mr. Silva-Arzeta asserts that he had raised the issue in his opening brief, but I do not believe that he did.

Given the trial court's broad discretion in the receipt of evidence, in most cases we would not find plain error in such an evidentiary ruling. But in these truly extraordinary circumstances I believe that we can and should find plain error in this evidentiary ruling. The trial judge's admission of Exhibit 5 in the face of the abject failure to establish the chain of custody was an abuse of discretion.

Under these unusual circumstances I would find that it was plain error to admit Exhibit 5 and would therefore reverse the convictions.

**II**

I add the following observations because I am genuinely troubled by the confluence in one case of so many law enforcement practices that fall short of inspiring full confidence. And of course I hope that remedial measures will be taken. It is certainly in the interests of law enforcement to at least strive to follow "best practices."

As the court's opinion points out, "best practices" were not followed during Mr. Silva-Arzeta's interrogation at the police station. Unfortunately, there are other instances in the case in which best practices were ignored. Officer Mackenzie took the lead in questioning Mr. Silva-Arzeta at the scene and obtaining his consent to search the apartment. As the court's opinion notes, Officer Mackenzie spoke to Silva-Arzeta in English and later testified that Silva-Arzeta appeared to have understood the questions, but the officer also noted Silva-Arzeta's accent and quickly inferred that Silva-Arzeta probably was more

comfortable speaking in Spanish (and so Mackenzie did not himself conduct the later interrogation at the station). In these circumstances, it is surprising that the officer did not follow the common practice of asking Mr. Silva-Arzeta to give written consent to the search of his apartment.[2]

When it appears that the services of an interpreter are necessary at trial, the Court Interpreters Act provides for appointment of a certified interpreter, as was provided for Mr. Silva-Arzeta in both of his trials on the present charges. Officer Khalil is not a certified interpreter but a police officer who had attained some minimal level of proficiency through a program intended to train officers to deal with situations often faced in the course of their duties when circumstances do not permit use of fully trained interpreters. As this case demonstrates, however, it may be cold comfort indeed to provide a criminal defendant with the services of a certified interpreter at trial when the most damning evidence to be admitted at that trial is a challenged translation of the defendant's own statements made during interrogation. Thus the Justice Department recommends use of certified interpreters instead of police officers, as the court's opinion notes, and the department recommends the recording of interrogations as an alternative. Neither of these better practices were followed in this case. Nor did Officer Khalil even ask Mr. Silva-Arzeta to make a written statement at the end of the interrogation,

---

[2]Of course I do not suggest that oral consent is invalid or ineffective. This case illustrates, however, the prudence of the practice of obtaining written consent where practical.

-5-

another practice that our cases show is commonly used by many law enforcement agencies.

Again, none of these practices is mandatory under the Due Process Clause. But the repeated instances in a single case of failure to follow preferred procedures raises serious concerns.

**III**

Therefore, I must respectfully dissent. I would reverse in the interests of justice.