**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 13, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TERRY DALE RAY,

    Defendant - Appellant.

No. 18-6227
(D.C. No. 5:17-CR-00146-R-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **McHUGH**, and **CARSON**, Circuit Judges.
_____

Law enforcement officers questioned Defendant Terry Ray following his

roadside arrest without the benefit of <u>Miranda</u> warnings.[1]  Defendant's responses

alerted the deputies to contraband in Defendant's vehicle and elsewhere.  Despite the

lack of <u>Miranda</u> warnings, the government contends that Defendant voluntarily made

his statements to the deputies.  Defendant, on the other hand, contends that his

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966) (holding that law enforcement officers must warn an individual of certain constitutional rights and the consequences of waiving those rights prior to conducting a custodial interrogation).

roadside statements were the product of police coercion, thus rendering evidence recovered pursuant to those statements, and later statements, inadmissible.

Additionally, law enforcement obtained a warrant to search Defendant's residence based on an affidavit that contained misstatements. Law enforcement uncovered additional contraband in the execution of the warrant. The government contends that any misstatements in the affidavit were accidental and immaterial. Defendant, on the other hand, contends that the misstatements rendered the warrant invalid and the resulting evidence inadmissible. The district court denied Defendant's motions to suppress on all relevant grounds. Our jurisdiction arises pursuant to 28 U.S.C. § 1291. We affirm.

I.

Custer County (Oklahoma) Deputy Dylan King arrested Defendant for a traffic violation.[2] While searching Defendant, Deputy King discovered methamphetamine. Deputy King asked Defendant whether he had any other contraband and Defendant replied that he did in his vehicle. After Defendant realized he was going to jail, he cried and made suicidal comments. Deputy King handcuffed Defendant, placed Defendant in his patrol vehicle, and started an inventory search of Defendant's vehicle.

Custer County Deputy Quinton Short soon arrived to assist Deputy King. Deputy Short counseled Defendant and assisted with the inventory search of

---

[2] Body camera footage on file with the Court captured the entire interaction.

2

Defendant's vehicle, repeatedly returning to the patrol vehicle to ask Defendant about the presence of contraband. When Deputy Short asked Defendant what else was in the vehicle, Defendant hesitantly admitted that he had a blasting cap (an explosive) in the vehicle. Deputy Short recovered the blasting cap from Defendant's vehicle. At no time during this roadside encounter did either deputy issue Miranda warnings to Defendant.

Defendant also told Deputy Short that, although he had only one blasting cap in the vehicle, he had a lot more at another, undisclosed location. Deputy Short relayed to Deputy King and others that Defendant said he had more blasting caps at his house. Upon referring the case to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Deputy King repeated Deputy Short's misstatement to ATF Special Agent Brenden Taylor.

Shortly thereafter, Special Agent Taylor and a colleague twice interviewed Defendant at the Custer County Jail. Each time, the ATF agents read Defendant Miranda warnings and Defendant signed a waiver of those rights prior to questioning. Defendant admitted that he had one hundred or so blasting caps, but refused to disclose their specific location. Defendant also admitted using a blasting cap in his yard, but suggested the blasting caps were not at his house because he did not own that house. After the first interview, the agents observed evidence of the use of a blasting cap outside Defendant's residence. There, the agents also met Heath Justice, a family friend of Defendant. The next day, Justice informed law enforcement that Defendant placed a recorded call to him from jail asking Justice to retrieve an item

3

law enforcement was looking for from the couch in Defendant's residence. Special Agent Taylor then obtained a warrant to search the residence. Upon execution of the warrant, agents discovered three boxes of blasting caps.

A grand jury indicted Defendant with being a felon in possession of explosives in violation of 18 U.S.C. § 842(i)(1), as well as an unrelated offense. Defendant filed two motions to suppress: one to suppress evidence from his roadside encounter with the deputies and his subsequent statements to the ATF agents, and a second to exclude evidence recovered pursuant to the search warrant. The district court denied the motions, except as to Defendant's unwarned statements to the deputies. Thereafter, Defendant pleaded guilty to a Superseding Information charging him with being a felon in possession of a destructive device in violation of 18 U.S.C. § 922(g)(1). The district court sentenced him to 108 months' imprisonment. Defendant appealed the denials of his motions.

II.

Defendant contends the district court erred in denying his motions to suppress the physical fruit of his unwarned statements, his statements made to ATF agents while in custody, and evidence discovered pursuant to a search warrant. Specifically, Defendant argues that he did not voluntarily make his statements to either the deputies or ATF agents. Defendant also argues that law enforcement obtained a search warrant based on materially false information.

"When reviewing an order granting or denying a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and view the evidence in

4

the light most favorable to the district court's findings." United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997). We review de novo "the ultimate issue of whether a statement was voluntary" under the Fifth Amendment. United States v. Pettigrew, 468 F.3d 626, 633 (10th Cir. 2006) (citation omitted). We likewise review de novo the reasonableness of a search warrant under the Fourth Amendment. United States v. Kennedy, 131 F.3d 1371, 1375 (10th Cir. 1997). Our review grants particular deference to the district court's determinations "regarding the truth or falsity of statements in the affidavit and regarding the intentional or reckless character of such falsehoods." United States v. Campbell, 603 F.3d 1218, 1228 (10th Cir. 2010).

## A.

The Self-Incrimination Clause of the Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The Supreme Court has interpreted this clause to provide a "privilege against self-incrimination during custodial interrogation." Miranda, 384 U.S. at 490; see also United States v. Patane, 542 U.S. 630, 636 (2004) (explaining that the Supreme Court created the Miranda rule as "a prophylactic employed to protect against violations of the Self-Incrimination Clause"). "The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement." Patane, 542 U.S. at 636. Accordingly, the failure to provide a suspect with Miranda warnings does not require suppression

5

of the physical fruit of a "suspect's unwarned but voluntary statements." Id. at 634

(requiring suppression of only the physical fruit of coerced statements (id. at 644)).[3]

We have routinely applied this principle to affirm the admission of "physical

evidence seized as a result of a Miranda violation." See, e.g., United States v.

Pettigrew, 468 F.3d 626, 635 (10th Cir. 2006) (also observing that the Supreme Court

"recognized that custodial statements made prior to the delivery of Miranda warnings

do not necessitate exclusion of any subsequent confession"). Although "a Miranda

violation raises a presumption of coercion," Patane, 542 U.S. at 646, the test is

"whether a [suspect's] will was overborne by the circumstances surrounding the

giving of a confession," Dickerson v. United States, 530 U.S. 428, 434 (2000)

(internal quotation marks and citation omitted). See also Colorado v. Connelly, 479

U.S. 157, 167 (1986) (concluding "that coercive police activity is a necessary

predicate to the finding that a confession is not voluntary" (internal quotation marks

omitted)). The test, based upon the totality of the circumstances, considers "both the

characteristics of the accused and the details of the interrogation." United States v.

Toles, 297 F.3d 959, 966 (10th Cir. 2002). Relevant factors can include: "(1) the

age, intelligence, and education of the defendant; (2) the length of detention; (3) the

length and nature of the questioning; (4) whether the defendant was advised of his

---

[3] Defendant asserts that Patane was wrongly decided and advances the argument so as to preserve it. Of course, we cannot overrule a Supreme Court opinion, and will not attempt to do so here. See, e.g., Burrell v. Armijo, 456 F.3d 1159, 1171 n.9 (10th Cir. 2006).

constitutional rights; and (5) whether the defendant was subjected to physical punishment." Id.

Here, Defendant contends that the admission of the blasting cap recovered from his vehicle violates his Fifth Amendment rights. Specifically, Defendant contends that the deputies physically and psychologically coerced him into making involuntary statements about the blasting caps. Although the district court suppressed Defendant's unwarned statements about the blasting caps obtained in violation of Miranda, it concluded that Defendant made these statements voluntarily and, therefore, declined to suppress the actual blasting cap found in his vehicle. We agree with the district court.

First, the deputies did not physically coerce Defendant into disclosing the blasting cap in his vehicle. Supreme Court and Tenth Circuit precedent establishes that while "arresting and handcuffing are coercive acts," the statements "of a handcuffed arrestee may well be voluntary," even in the absence of Miranda warnings. See United States v. Silva-Arzeta, 602 F.3d 1208, 1215 (10th Cir. 2010); see also United States v. Watson, 423 U.S. 411, 424 (1976) (observing that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession"). Indeed, the proper inquiry centers on whether an arrestee suffered "physical mistreatment, use of violence or threats of violence," or similar intrusions on his person. United States v. Dozal, 173 F.3d 787, 796 (10th Cir. 1999).

In this case, Defendant made his incriminating statements while handcuffed inside a patrol vehicle. See Silva-Arzeta, 602 F.3d at 1215. However, neither deputy

7

physically mistreated, threatened, or otherwise contacted Defendant in any impermissible way. See Dozal, 173 F.3d at 796. Instead, the deputies acted in a restrained manner towards Defendant and did not draw their weapons at any time. See Silva-Arzeta, 602 F.3d at 1215 (10th Cir. 2010) (following case law "finding consent to be voluntary when guns were holstered before request to search"). Accordingly, the deputies' lack of physical coercion weighs in favor of the conclusion that Defendant made his roadside statements voluntarily.

Likewise, the deputies did not coerce Defendant's statements through non-physical means. In considering the characteristics of a defendant, his "diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." United States v. Guerro, 983 F.2d 1001, 1004 (10th Cir. 1993). "[T]o find a statement involuntary, the police must somehow overreach by exploiting a weakness or condition *known to exist*." Id. (emphasis added). The Fifth Amendment does not "protect a defendant from his own compulsions or internally-applied pressures which are not the product of police action." Id. Indeed, if law enforcement is reasonably unaware of a defendant's mental vulnerabilities, law enforcement cannot be responsible for exploiting them. See Connelly, 479 U.S. at 164 (reasoning that a "mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness'").

Here, Defendant's mental health history and emotional reaction to his arrest cannot alone demonstrate that the deputies took advantage of his mental state. See

8

id. Even though Deputy Short knew of Defendant, and Defendant had received mental health treatment in the past, Defendant identifies no evidence that Deputy Short exploited Defendant's mental health status.[4] See Guerro, 983 F.2d at 1004. Although Defendant made suicidal comments upon realizing he was under arrest, he concedes that Deputy Short first "counseled him in a[n] amicable conversation" before questioning him about contraband. As a result, Defendant appeared composed when Deputy Short questioned him about contraband in his vehicle. See United States v. Lamy, 521 F.3d 1257, 1262 (10th Cir. 2008) (reasoning that evidence a person "was capable of understanding the agents' questions" indicated that he was also capable of "assessing the risks of answering or declining to answer those questions" voluntarily). Deputy Short's body camera footage further confirms that he did not press Defendant about his mental health, but rather focused his brief inquiries on the presence and location of contraband—a topic wholly divorced from Defendant's mental health status. Thus, the record indicates that the deputies did not take "unfair advantage" of Defendant's mental state or coerce his statements by pressing on any expressed vulnerabilities. See Guerro, 983 F.2d at 1004.

---

[4] The record indicates that Deputy Short was generally aware of Defendant from a previous arrest and once overheard a conversation with other law enforcement officers that Defendant had visited Red Rock. Deputy Short was also aware that Red Rock provides a variety of services, including mental health treatment, drug treatment, and counseling. Indeed, Deputy Short knew Defendant had drugs on him before he questioned Defendant. The record does not indicate, however, that Deputy Short was aware of specific diagnosis or treatment information, or that any such information influenced how he questioned Defendant about contraband.

Accordingly, the deputies' lack of psychological coercion also weighs in favor of the conclusion that Defendant made his roadside statements voluntarily.

Moreover, the limited and conversational nature of the interaction weigh in favor of the voluntariness of Defendant's statements. See Toles, 297 F.3d at 966. After placing Defendant under arrest, the deputies only spoke with him in short increments. See Supp. ROA Vol. I. (Deputy Short's body camera footage) at 1:20–8:22 (counseling Defendant), 9:30–10:00 (inquiring about contraband), 11:05–11:55 (inquiring about the blasting cap). Deputy Short solicited the incriminating statements about ten minutes after he arrived on the scene, and Defendant's roadside detention lasted about forty minutes from when Deputy King first stopped Defendant. See Lamy, 521 F.3d at 1262 (considering an interview that "lasted less than an hour" to be short in length). Although two deputies were present for most of the encounter, only one deputy spoke to Defendant at a time. See Silva-Arzeta, 602 F.3d at 1215 (observing that the presence of several officers is "unlikely to have produced much of a coercive effect" because only one officer spoke to the subject). The deputies' tone and demeanor were also conversational throughout the encounter. See Lamy, 521 F.3d at 1262 (reasoning that the "nonthreatening nature of questioning" limits the coercive effects of a law enforcement encounter). Altogether, the deputies' non-threatening approach, conversational tone, and short duration of conversation limit the coerciveness of the interaction and, therefore, demonstrate the voluntariness of Defendant's statements.

To be sure, the Supreme Court has generally required much more aggressive law enforcement tactics to support a determination of unconstitutional coercion. See Connelly, 479 U.S. at 165 (observing that undue police coercion includes the administration of "a drug with truth-serum properties" or subjecting a suspect to an "eight- to nine- hour sustained interrogation"). Thus, we conclude that Defendant made his roadside statements voluntarily, even though the statements themselves were inadmissible in the absence of Miranda warnings. Accordingly, the district court correctly concluded the physical evidence recovered pursuant to Defendant's inadmissible statements was admissible under Patane.

B.

We next consider whether Defendant's later statements to ATF agents at the Custer County Jail were admissible. Defendant contends that he remained under the influence of police coercion from his unwarned roadside encounter, so any subsequent statements to the agents are likewise the product of coercion. The district court found that Defendant participated freely in the county jail interviews and declined to suppress Defendant's statements therefrom. We agree with the district court for two reasons: (1) the deputies did not subject Defendant to undue police coercion during his roadside encounter, see supra Part II(A), and (2) even if they had, coerciveness—as a matter of Supreme Court precedent—does not generally carry over to a later, unrelated interview, see Oregon v. Elstad, 470 U.S. 298, 313 (1985).

Preliminarily, we reject the initial premise of Defendant's argument by concluding that Defendant made his roadside statements voluntarily, rather than as a

11

product of coercion.  See supra Part II(A).  Nevertheless, the Supreme Court has held that even where Miranda requires a court to suppress an unwarned statement, "the admissibility of any subsequent statement should turn . . . solely on whether it is knowingly and voluntarily made."  Elstad, 470 U.S. at 309.  Moreover, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion."  Id. at 314.  Therefore, a "subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."  Id.

In this case, Defendant made unwarned but voluntary statements to the deputies.  See supra Part II(A).  Defendant then provided additional statements to ATF agents after the agents read Defendant Miranda warnings and Defendant signed a waiver of those rights.  Defendant does not identify any actions by the ATF agents that independently coerced him into waiving his Miranda rights or otherwise involuntarily speaking to them.  Instead, Defendant's coercion argument as to these statements relies exclusively on the effects of his unwarned, roadside encounter—an argument that the Supreme Court expressly rejected as a basis to suppress subsequent, warned statements.  See United States v. Carrizales-Toledo, 454 F.3d 1142, 1149 (10th Cir. 2006) (recognizing that the Supreme Court "rejected the theory that the initial, unwarned statement creates a 'lingering compulsion' based on 'the psychological impact of the suspect's conviction that he has let the cat out of the bag

12

and, in so doing, has sealed his own fate'" (quoting Elstad, 470 U.S. at 311 (1985)).

Accordingly, Defendant's prior unwarned statement to the deputies did not taint his later, voluntary statements to ATF agents. Thus, we conclude that Defendant's later statements to ATF agents at the Custer County Jail were admissible.

C.

We finally consider whether evidence—more blasting caps—that agents recovered from Defendant's home pursuant to a search warrant was admissible. Defendant contends that the ATF agents obtained the additional blasting caps in violation of his Fourth Amendment rights because the search warrant was based on materially false information. Specifically, Defendant challenges two statements in Special Agent Taylor's search warrant affidavit: (1) Defendant told deputies that he had more blasting caps "at his residence" after his roadside arrest; and (2) Defendant told the agents that he was keeping blasting caps "in a secret location at the subject residence" during his April 3 interview. The district court declined to excise the challenged statements from the search warrant affidavit and, therefore, declined to suppress evidence recovered from the subsequent search of Defendant's residence. We again agree with the district court.

The Fourth Amendment protects the right of the people to be secure in their houses and effects against unreasonable searches and seizures. U.S. Const. Amend. IV. The text requires that the issuance of a search warrant be based upon probable cause. Id.; Illinois v. Gates, 462 U.S. 213, 231 (1983). We exclude evidence discovered pursuant to a search warrant when: (1) "a defendant proves by a

13

preponderance of the evidence the affiant knowingly or recklessly included false statements in or omitted material information from an affidavit in support of a search warrant;" and (2) "after excising such false statements and considering such material omissions . . . [we conclude] the corrected affidavit does not support a finding of probable cause." Campbell, 603 F.3d at 1228 (alterations in original) (internal quotation marks and citation omitted).

Concerning the first challenged statement, Defendant undisputedly did not tell Deputy Short that he had more blasting caps "at his residence." Instead, the record confirms that Defendant said he only had one blasting cap in his vehicle, but had "a lot more than that" without disclosing a location. Although Defendant does not argue that Deputy Short knowingly misquoted Defendant, he contends that Deputy Short and those who relied on his hearsay statement acted recklessly. Specifically, Defendant asserts that Deputy Short was reckless in misquoting Defendant and Special Agent Taylor was likewise reckless in failing to confirm the quote with Deputy Short's body camera recording of the interaction. Defendant, however, fails to carry his burden of demonstrating that Special Agent Taylor knowingly or recklessly included false statements in his search warrant affidavit because we conclude the record does not establish: (1) that Deputy Short was reckless in misquoting or conveying Defendant's statement, or (2) that Special Agent Taylor was reckless in relying on that information. See Campbell, 603 F.3d at 1228.

First, the hasty nature of Deputy Short's roadside conversation with Defendant suggests that Deputy Short's original misstatement was accidental. See Franks v.

14

Delaware, 438 U.S. 154, 165 (1978) (recognizing that affiants must often rely upon hearsay or other information "that sometimes must be garnered hastily," so we consider information to be truthful if "the information put forth is believed or appropriately accepted by the affiant as true"). Within seconds of hearing Defendant's statement about additional blasting caps, Deputy Short told Deputy King that Defendant said he had "a whole lot more of them at his house." See Christopher B. Mueller & Laird C. Kirkpatrick, 4 Fed. Evid. § 8:67 (4th ed. June 2019 Update) (evidence law recognizes that "a small delay" between observation and retelling makes a statement particularly trustworthy because such a delay "is not enough to allow reflection"). Deputy Short consistently repeated this misstatement to other law enforcement personnel, who conveyed the misstatement to Special Agent Taylor.

Presumably, in light of Deputy Short's immediate and consistent retelling of the misstatement, Defendant does not dispute whether Deputy Short or Special Agent Taylor believed the misstatement to be true. See Franks, 438 U.S. at 165. Indeed, the conveyance of incorrect information appeared to be, at most, the product of negligence, which is insufficient to justify the exclusion of evidence. See Campbell, 603 F.3d at 1228 (recognizing that a defendant must do more than identify "the existence of the [misstatements] themselves" to demonstrate "an intent to mislead or recklessness on the part of the officers" (id. at 1229)). Thus, we conclude Deputy Short's misstatement does not provide a valid basis to excise the first challenged statement from the search warrant affidavit because the record does not show Deputy Short intentionally or recklessly misquoted Defendant. Id.

15

Next, Special Agent Taylor's inclusion of Deputy Short's misstatement in the search warrant affidavit likewise does not rise to the level of recklessness. As a matter of course, affiants routinely rely on information relayed to them from other law enforcement personnel. See, e.g., United States v. Tisdale, 248 F.3d 964, 974 (10th Cir. 2001) (observing that an affiant's inclusion of assumed but unverified information relayed to him by another officer was "reasonable"). Defendant asserts that Special Agent Taylor's failure to check Deputy Short's body camera footage before including a representation in an affidavit constitutes recklessness, but he does not identify any authority to support that proposition. Conversely, the Supreme Court has recognized that the rule for exclusion "leaves a broad field where . . . police have been merely negligent in checking or recording the facts relevant to a probable-cause determination." Franks, 438 U.S. at 170. Deputy King repeated Deputy Short's misstatement to Special Agent Taylor, which both deputies' police reports contained. Thus, Special Agent Taylor was not reckless in relying on information relayed to him from other law enforcement sources.

Concerning the second challenged statement, Defendant asserts that he did not actually tell ATF agents that he had blasting caps at his residence during his interview. The government counters that Defendant admitted using a blasting cap at his residence and engaged in a game of semantics, which Special Agent Taylor reasonably interpreted as an admission that the additional blasting caps were at his residence. Specifically, Defendant suggested that the agents would not find the blasting caps in a search of *his* house because the subject residence was "not *my*

16

house." Special Agent Taylor interpreted this exchange as a game of semantics regarding who owned the residence at which Defendant lived, rather than a denial that the blasting caps were in Defendant's residence.

Although Special Agent Taylor exercised some measure of interpretation to construe Defendant's interview statements to mean that the blasting caps were at his residence, his conclusion was not necessarily knowingly false or reckless. See Campbell, 603 F.3d at 1229 (10th Cir. 2010) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Rather, Special Agent Taylor reasonably believed that Defendant previously told the deputies the blasting caps were at his residence and saw evidence of the use of a blasting cap at his residence, so his subsequent belief that Defendant was again referring to his residence during the interview was likewise reasonable. See Franks, 438 U.S. at 165. Additionally, Defendant called Justice the day after he spoke with Special Agent Taylor to ask Justice to retrieve an item law enforcement was looking for—the blasting caps—from the couch of his residence. This uncontested information, which Special Agent Taylor separately included in his affidavit, further corroborated Special Agent Taylor's belief that Defendant knew he was discussing blasting caps at his residence during the interview. Thus, we conclude that the district court correctly declined to excise either challenged statement from the search warrant affidavit. Accordingly, the blasting caps recovered from Defendant's residence pursuant to the execution of a valid search warrant were also admissible.

III.

For the foregoing reasons, we AFFIRM the district court's orders denying, in pertinent part, Defendant's motions to suppress.

Entered for the Court


Joel M. Carson III
Circuit Judge