*WILLIAM SCOTT V. STATE*, No. 3351 September Term, 2018.   Opinion by Eyler, Deborah S., J.

**CONSTITUTIONAL LAW - - FOURTH AMENDMENT SEARCH AND SEIZURE - - CONSENT SEARCH - - VOLUNTARINESS - - ROADSIDE TRAFFIC STOP - - SEARCH OF PASSENGER.**

The defendant was one of two passengers in a minivan lawfully stopped by the police for speeding on a hot summer afternoon on a busy road in Montgomery County. A canine unit was called immediately because a stop of the same minivan three weeks prior had led to heroin trafficking charges against a passenger (who was not in the minivan this time).

Five officers were involved in the stop. For about 13 minutes, the driver, the defendant, and the other passenger sat in the minivan, chatting with two officers. The defendant was hunching over and from time to time complained of feeling hot and of having been overcharged for a hotel room. The atmosphere of the traffic stop was nonconfrontational.  When the K-9 unit arrived, the occupants of the minivan were told to get out.  Despite being warned he was about to do so, the defendant dropped his phone and wallet when he stood up.  He retrieved them and walked, still hunching over, to the median strip next to the minivan.  Because that location was too close to the area the canine would be sniffing, an officer told the defendant not to sit there and, when he stumbled, guided him to a place to sit farther down the median strip. The defendant sat down next to another officer, who was standing on the median strip.

The driver was briefly patted down after he revealed knives in his pocket (which the police returned to the minivan) and the other passenger was searched by consent. There was no evidence that the defendant saw either search.

As he sat on the median strip, the defendant began to grab the right front pocket of his shorts.  The police officer standing next to him said he did not want him grabbing the pocket and asked, "May I reach inside and get it?"  The defendant answered "yes" and nodded his head affirmatively. The officer reached in the pocket and took out some over the counter medicine, a pack of cigarettes, and some money.  As he looked through those items, the defendant leaned slightly to his left, and the officer saw the butt of a handgun in his waistband and the gun's outline. The handgun was seized and the defendant was arrested. In a search incident, an Adderall pill was found in another pocket.

After being charged with various offenses, the defendant moved to suppress the handgun and Adderall pill from evidence, asserting they had been seized in violation of his Fourth Amendment rights. In an evidentiary hearing that included testimony by several officers and body camera evidence, the officer who searched the pocket stated that he only was able to see the handgun because the items were removed from the

defendant's pocket. The court ruled that the defendant voluntarily consented to the search of his pocket and denied the motion. The defendant took a conditional plea to handgun possession and possession of Adderall and noted an appeal, challenging the search.

*Held*:   Judgments affirmed.   Under the Fourth Amendment, as a passenger in a lawful traffic stop, the defendant was detained legally for the period of time needed to fulfill the purpose of the stop.   A search of such a detained passenger only would be proper if the criteria of *Terry v. Ohio* or its exceptions were met. One such exception is consent to search, if the consent was given voluntarily. Under *Schneckloth v. Bustamonte,* consent to search is voluntary if, under the total circumstances, consent was freely given and was not the product of duress or coercion, express or implied.   The State bears the burden to prove voluntariness by a preponderance of the evidence.

The suppression court's factual findings in support of voluntariness of consent were supported by competent and material evidence in the record and the total circumstances supported the conclusion that consent to search was freely given by the defendant.   The stop was on a busy road, in daylight, in full view of rush hour traffic. There were five police officers but three of them had little to no interaction with the defendant.   Most of the traffic stop consisted of the occupants of the vehicle engaging in friendly banter with the officers. The officers helped the defendant navigate to a safe area to sit on the median strip. The defendant was not asked any questions at all, and the officers did not seem to have any suspicions that he was engaging in any illegal activity until he started grabbing his pocket. The officers were polite throughout.   When the officer who asked for consent to reach into the defendant's pocket did so, he spoke calmly, not in a raised voice, and clearly was requesting permission, not demanding compliance. The defendant knew his handgun was not in the pocket the officer was asking to search. The defendant responded affirmatively, both orally and by nodding.

Although the defendant mentioned Article 26 of the Maryland Declaration of Rights in his brief, he did not raise it below and did not make an argument about it on appeal.

Circuit Court for Montgomery County
Case No. 134380C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 3351

September Term, 2018

_____

WILLIAM SCOTT

v.

STATE OF MARYLAND

_____

Fader, C.J.
Leahy,
Eyler, Deborah S.
        (Senior Judge, Specially Assigned)

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed: July 29, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

William Scott, the appellant, was a passenger in a vehicle lawfully stopped for speeding. During the traffic stop, he answered yes and nodded affirmatively to a police officer's request to search his right front pants pocket. After the officer removed some items from that pocket, Scott moved slightly, and the officer saw a handgun in his waistband. The handgun was seized, Scott was arrested, and in a search incident to arrest, an Adderall capsule was found in another pocket.

Scott was indicted for wearing, carrying, and transporting a handgun, possession of Adderall, and other crimes, and moved to suppress the handgun and Adderall from evidence. The court denied the motion, ruling that Scott had consented voluntarily to the search of his pants pocket. Scott took a conditional guilty plea to the handgun and Adderall possession charges and was sentenced by the court.[1]

On appeal, Scott asks whether the suppression court erred in denying his motion. We answer in the negative and shall affirm the judgments.

## SUPPRESSION HEARING FACTS AND COURT'S RULING

The State called four officers with the Montgomery County Police Department's Sixth District Community Action Team ("CAT"): Sergeant Robert Sheehan and Officers William Weill, Marshall Weider, and Timothy Serlo. It also introduced into evidence a

---

[1]The court sentenced Scott to three years, suspend all but two days, with credit for two days' time served, for the handgun conviction and did not impose a sentence for possession of Adderall. The other charges were dismissed as part of the plea agreement.

DVD containing police body camera videos from several officers and documents, including still photographs from some of those videos.

The search in question took place on July 16, 2018. That afternoon, Sergeant Sheehan was working undercover in the Gaithersburg area. While driving into the parking lot of the Extended Stay Hotel at 205 Professional Drive, a location known for drug activity and prostitution, he recognized a dark green Buick minivan heading toward the exit. He had stopped that same minivan almost a month earlier, on June 21, 2018. At that time, the minivan had had three occupants: John Dicks, the driver and owner; Andre Stevenson, the front seat passenger; and Danielle Kidwell, the backseat passenger.

Evidence generated from the June 21 stop of the minivan had been used to obtain an arrest warrant for Stevenson for heroin trafficking and as of July 16 the police still were looking for him to serve the warrant. Thinking Stevenson might be in the minivan, Sergeant Sheehan followed it south on Frederick Road. He paced it for about half a mile and determined its speed to be 10 miles per hour over the posted speed limit.[2] He radioed Officer Weill, who was nearby, and told him to stop the minivan for speeding. Officer Weill was in uniform and driving a marked police cruiser.

At 4:42 p.m., Officer Weill stopped the minivan in the leftmost of three southbound lanes of Frederick Road, near its intersection with Gunners Branch Road, in a

---

[2]The State introduced into evidence documents supporting Sergeant Sheehan's calculation of the minivan's speed.

heavily populated area. It was rush hour on a Monday and the traffic was steady. The weather was overcast and very hot.[3]

When Officer Weill approached the driver's side of the minivan, he saw there were three occupants. From the June 21 traffic stop, he recognized the driver as Dicks and the backseat passenger as Kidwell. A male front seat passenger was holding some papers and complaining about a hotel overcharging him. Because the man was looking down, Officer Weill could not tell if he was Andre Stevenson. Officer Weill told Dicks he had been stopped for speeding and asked for his driver's license and registration, both of which Dicks turned over. Officer Weill returned to his cruiser and began processing the traffic violation.

Officers Weider and Serlo, and Officer Ruth Zotti (who did not testify), all in uniform, arrived at the scene close behind Officer Weill. A K-9 unit was called right away. A minute after Officer Weill returned to his cruiser, Officers Weider and Zotti approached the passenger side of the minivan and Officer Weider motioned for the front seat passenger to open his window. He did so, and asked Officer Weider whether he wanted identification. Officer Weider responded yes, and the passenger handed him his identification card, which showed that his name was William Scott and that he was born in 1976. Officer Weider took some notes about the card, returned it to Scott, and gave

---

[3]The high temperature recorded that day near Gaithersburg was 95 degrees, and it was still in the 90s by the time of the traffic stop. *See* https://www.wunderground.com/history/daily/us/md/gaithersburg/KGAI/date/2018-7-16 (last visited June 19, 2020).

the notes to Officer Weill in his cruiser.  Officer Zotti did likewise as to Kidwell's identification.

Officer Weider walked to the median strip, which is wide and grassy, and stood about two car lengths behind the minivan.  Officer Serlo stayed next to the driver's side of the minivan.  He could see Scott and noticed that he was "kind of hunched over" and "didn't look like he felt okay."  Scott's papers, cell phone, and wallet were in his lap.  He stayed hunched over and sitting forward most of the time he was in the minivan.  Officer Zotti stood by the passenger's side of the minivan.

The two officers conversed with the three occupants of the minivan.  Dicks had turned off the vehicle's air conditioning, and Scott was complaining about the heat.  Dicks complained that every time he gave someone a ride, he got stopped and, in a half-joking tone, told Kidwell he would no longer give her rides.  He showed Officer Serlo papers concerning the June 21 stop, then began scrolling through his cell phone.  Apparently, he opened a real estate website because Officer Serlo, who could see the phone from where he was standing, asked whether he was looking to buy a house.  Dicks said yes and showed Officer Serlo photographs of houses.  Dicks and Officer Serlo exchanged comments about various houses, including about how expensive some of them were.

On the other side of the minivan, Officer Zotti chatted with Kidwell, who was scratching off lottery tickets.  Kidwell asked whether the sliding door could be opened because of the heat and Officer Zotti said that would be fine.  Kidwell and Officer Zotti talked about a tattoo Kidwell had designed and applied to her knee.  At one point, Scott

resumed complaining about his hotel bill and Officer Zotti asked him what was wrong with it. He replied that his credit card had been charged for two nights instead of one.

In the meantime, Sergeant Sheehan had parked his unmarked vehicle in a lot across the street to watch the traffic stop. He got out of his vehicle, put on his police vest, and waited near the minivan, by the median strip.

The K-9 unit arrived at 4:54 p.m., twelve minutes after the traffic stop began.[4] Police policy required the vehicle's occupants to exit so they would not be bitten by the canine, and for them to be far enough away from the vehicle so their presence wouldn't interfere with the scan. Remarking that they had done this before, evidently a reference to the June 21 traffic stop, Officer Serlo told Dicks to get out.[5] When asked whether he was carrying knives, Dicks answered "yes" and showed Officer Serlo knives he had in two side pants pockets. Officer Serlo took them, handed them to Sergeant Sheehan, and performed a brief pat down of Dicks's waist area, near the side pants pockets. After telling Dicks he was doing so, Sergeant Sheehan put the knives in the minivan.[6]

---

[4]The parties stipulated to the time the K-9 unit arrived.

[5]This happened at 4:55 p.m.

[6]The brief pat down of Dicks took place at the driver's side of the minivan, next to the window behind the driver's seat. Scott was still sitting in the vehicle. Although it would appear that he did not see the pat down because of his location relative to Dicks, that is not clearly established.

Sergeant Sheehan then approached the passenger's side of the minivan and told Scott to get out.[7]  As Scott stood up, holding his papers, Sergeant Sheehan said, "Watch your stuff," referring to the cell phone and wallet.  Scott either didn't hear or wasn't focusing and his wallet and cell phone fell off his lap to the ground.  According to Sergeant Sheehan, Scott took "a little longer" than would be expected to pick these items up.  As Scott began walking toward the median strip, hunched over, Sergeant Sheehan asked him whether something was wrong.  Scott didn't answer, so Sergeant Sheehan asked Kidwell, still in the minivan, whether Scott was drunk.  She replied no, that he had "sickle cell."[8]  At no time during the traffic stop did Scott himself mention having sickle cell disease or any illness.

As soon as Scott reached the median strip, he began to sit down on the curb next to the minivan.  Officer Serlo saw him and said, "No, get up" because Scott would be too close to the canine scan.  He told Scott to go beyond the rear of the minivan, to an area on the median strip behind Officer Weill's cruiser and in front of the cruiser behind it.  As Scott stood up to move he stumbled.  Officer Serlo took hold of the back of his shirt and guided him to "prevent[] him from falling on the ground."  Once Scott reached the right location, Officer Serlo told him he could sit on the curb if he wanted to, as it was cooler

---

[7]This happened at 4:56 p.m.

[8]Sergeant Sheehan testified that he recalled Kidwell saying something about Scott's being sick, but not mentioning sickle cell disease.  The body camera records her saying "sickle cell disease."

-6-

there, away from the heat of the car engines. Scott sat down on the curb of the median strip facing the road.

Officer Serlo remained in the area, standing on the shoulder of the road, between Scott and Dicks. Officer Weider already was standing on the median strip near Scott and to his right. Scott was wearing a black tee shirt and low-slung jeans shorts with large front pockets. Because his tee shirt was not tucked in and he was hunching over, the waistband of his shorts was not visible. As Scott was sitting on the curb of the median strip, Officer Weider noticed a bulge around his right front pants pocket but could not tell whether it was from something in that pocket or his waistband. At the same time, Scott began "kind of grabbing in that front pocket area" and "manipulating the front pocket area." (Officer Serlo demonstrated for the court what he saw Scott doing and it is visible on his body camera video.) From experience, Officer Weider took this as an indication that Scott might be carrying a weapon. Officer Weider leaned over next to Scott, bending so their heads were close to the same level. In a calm but serious voice he said: "Okay well you're trying to grab it and I don't want you to grab it. May I reach into your pocket and get it?" Scott said "yes" and nodded his head affirmatively. [9]

Officer Weider reached inside Scott's right front pants pocket and removed a packet of over-the-counter medicine, a pack of cigarettes, and two twenty-dollar bills. Scott complained he "d[id] not feel good," and when Officer Weider asked why, he said he was hot and had not eaten. As Officer Weider was looking through the items he had

---

[9]Officer Weider posed his consent question at 4:57 p.m.

removed from Scott's pocket (commenting that he smelled marijuana on the items), Scott continued to complain about being hot. Then, still sitting on the curb, he leaned slightly to his left. As he moved, his tee shirt lifted a little, and Officer Weider could see the butt of a handgun and the weapon's outline in Scott's waistband.[10] Officer Weider yelled "handgun" and held Scott down. Officer Serlo grabbed the handgun, gave it to Sergeant Sheehan, and handcuffed Scott.[11] In a search incident to arrest, the Adderall capsule was found in another pocket.[12]

At the time that Scott consented to let Officer Weider reach in his pocket, Dicks was standing on the median strip, to Scott's left, and Kidwell was on the other side of Dicks. Two minutes earlier, as Kidwell had been starting to get out of the minivan, Officer Zotti noticed her move something from between her legs to her purse.[13] When she asked Kidwell what she was doing, Kidwell gave a non-response. Kidwell got out of the minivan and Officer Zotti asked for permission to search her. She replied yes. The search took place on the median strip at the same time Officer Weider was reaching into

[10]Officer Weider testified that he would not have been able to see the handgun if the items in Scott's right front pants pocket had not been removed.

[11]The handgun was recovered 42 seconds after Officer Weider asked Scott whether he could reach into his pocket.

[12]The State's DVD evidence contains body camera videos from Officers Weill, Weider, Serlo, and Zotti. The defense's DVD evidence contains body camera video from Sergeant Sheehan. The only body camera videos that show Officer Weider asking whether he could search Scott's front pants pocket, performing the search, and/or finding the handgun are from Officers Weider and Serlo.

[13]On Officer Zotti's body camera video the item appears to be a Bic lighter.

Scott's pocket. The body camera and still photograph evidence shows that when Kidwell was being searched, Scott either was looking toward Officer Weider, in the opposite direction from Kidwell, or was looking down at the ground. He is not seen looking in Kidwell's direction. When the handgun was spotted, Officer Zotti's search of Kidwell was over and Kidwell was sitting on the median strip.

Officer Serlo's body camera video shows that once the handgun was found and taken from him, Scott stopped hunching over. He stood up straight and argued with the police officers over why he was carrying a handgun.[14] He had no difficulty standing or speaking and stopped complaining that he didn't feel well.

While all this was happening, Officer Weill was inside his cruiser processing the traffic violation.[15] He did not see the events surrounding the search of Scott's pocket or the recovery of the handgun. Less than a minute after Scott was arrested, the canine alerted to the minivan. At that point, Officer Weill interrupted what he was doing and got

---

[14]Scott did not have a permit for the handgun and was telling the officers that he had purchased it because people had broken into his residence and he was scared. At sentencing, Scott repeated that reason and the court credited it, imposing a very light sentence.

[15]Officer Weill's scanner had been moved to the back seat of his cruiser to accommodate a police intern who was riding with him, so he had to enter Dicks's information into the police computer manually while searching multiple databases. When the K-9 unit arrived, Officer Weill briefly spoke to that officer, through his window, to bring him up to date. He then continued processing the traffic violation. Officer Weill's body camera video shows exactly what he was doing.

out of his cruiser to assist with the vehicle search. After that, he completed processing the traffic stop.[16]

The suppression court found that the traffic stop for speeding was lawful, was still in progress when the handgun was found, and was not prolonged beyond the time necessary for Officer Weill to process the violation.[17] It further found that the body

___

[16]Scott did not introduce evidence controverting the State's evidence. As noted, he introduced a DVD containing Sergeant Sheehan's body camera video. In addition, he called Officer Ware (no first name in the record) who was not present at the traffic stop but wrote a report about it in which he said the handgun was found during a pat down of Scott. Officer Ware acknowledged what he had written but explained that he had assumed, erroneously, that Scott had been patted down, but later learned that that had not happened. Scott also called a woman he was living with at the time who testified about aspects of the case having nothing to do with the traffic stop.

[17]In a footnote in his brief, Scott states that "his prolonged detention following his removal from the minivan itself represented a violation of the Fourth Amendment." He acknowledges that his argument "may be foreclosed by" *Arizona v. Johnson*, 555 U.S. 323 (2009). There, during a traffic stop, a passenger suggested that he was affiliated with a gang, prompting an officer to order him out of the vehicle, move him away from the driver, and perform a pat down for officer safety, which resulted in his finding a handgun. In a unanimous decision upholding the pat down on the ground that the police had reasonable suspicion that the passenger was armed and dangerous, the Supreme Court commented that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop. . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id*. at 333.

In this case, as in *Johnson*, there was no evidence indicating that the traffic stop had ended before the search of Scott's pocket was undertaken. The suppression court's finding that the traffic stop was not prolonged beyond the time necessary to fulfill its purpose was supported by the evidence, especially the body camera videos. The evidence showed that officers immediately called the K-9 unit at the inception of the stop and the canine search of the minivan took place before Officer Weill had finished processing the traffic stop. *See Rodriguez v. United States*, 575 U.S. 348 (2015) (police may not extend a traffic stop beyond the time needed to address the traffic violation in order to conduct a dog sniff, except upon reasonable suspicion). When the handgun was

(Continued…)

camera evidence "clearly show[s] officers being non-confrontational" with the passengers and "[m]aking small talk with both of them." The court determined that, in the body camera evidence, Scott "does not appear to be bothered by the officers in any way. He doesn't seem to be nervous and he's in fact, going over and has concerns about a hotel bill that he is chit-chatting with the officer about."

The court credited Officer Weider's testimony that Scott consented verbally to the search of his pocket and further found that Scott could be seen on the body camera footage nodding his head affirmatively.[18] It concluded that Scott's consent to the search of his pocket by Officer Weider was "freely and voluntarily given." The court observed, "[T]his was a very straight forward, hey can I go in your pocket. And it was a yes."

We shall address additional findings by the court in our discussion.

## STANDARD OF REVIEW

"Our review of the propriety of the denial of a motion to suppress is confined to the record of the suppression hearing." *Fitzgerald v. State*, 384 Md. 484, 490 (2004). We "view the evidence adduced at the suppression hearing, and the inferences fairly

---

(…continued)

spotted, the traffic stop only had been in progress for 15 minutes. *Cf. Carter v. State*, 236 Md. App. 456, *cert. denied*, 460 Md. 9 (2018) (holding that a 17 minute traffic stop for failure to make a complete stop at a stop sign and driving eight miles over the posted speed was not unreasonably lengthy and a brief halt in processing the stop to inform the K-9 officer who arrived at the scene and direct the defendant out of the vehicle for the canine search did not transform the legitimate stop into an illegal detention).

[18]The body camera videos did not capture Scott's verbal consent due to the loud traffic noise.

deducible therefrom, in the light most favorable to the party that prevailed on the motion[,]" here, the State. *Crosby v. State*, 408 Md. 490, 504 (2009).

The suppression "court's factual findings of voluntariness [of a consent to search] is not to be set aside unless clearly erroneous." *McMillian v. State*, 325 Md. 272, 285 (1992). With respect to the constitutional challenge to the search or seizure, we "render[] an 'independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case.'" *Pacheco v. State*, 465 Md. 311, 319-20 (2019) (quoting *Grant v. State*, 449 Md. 1, 15 (2016), in turn quoting *State v. Wallace*, 372 Md. 137, 144 (2002)).

## DISCUSSION

### *Contentions*

Scott contends any consent he gave Officer Weider to search his right front pants pocket was not voluntary because he was in a coercive environment and merely acquiesced in Officer Weider's request. Without voluntary consent, he argues, the search violated the Fourth Amendment to the federal constitution and Article 26 of the Maryland Declaration of Rights. Because the handgun only became visible once Officer Weider removed items from his pocket, the handgun was the product of the unconstitutional search, and should have been suppressed from evidence. Likewise, the Adderall, found in a search incident to the arrest brought about by the unconstitutional search, was the product of that search and should have been suppressed.

The State responds that none of the suppression court's factual findings were clearly erroneous and the total circumstances supported the court's assessment that Scott

voluntarily consented to the search of his right front pants pocket. After the search, Scott leaned over to one side and Officer Weider saw the butt of the handgun and its outline in Scott's waistband, giving the police probable cause to seize the handgun and arrest Scott. In a proper search incident to arrest, Officer Weider found the Adderall. Accordingly, the suppression court's ruling was not in error.[19]

### *Fourth Amendment Analysis*

The Fourth Amendment protects the people against unreasonable searches and seizures by the government, that is, those conducted without warrants issued upon probable cause.[20] There are judicially crafted exceptions, however, and in *Terry v. Ohio*, the Supreme Court recognized "the legitimacy of an investigatory stop 'in situations where [the police] may lack probable cause for an arrest.'" *Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968) (alteration in *Johnson*).

[19]Scott also argues, apart from the issue of consent, that the suppression court erroneously found that the police had probable cause or reasonable suspicion to search his right front pants pocket. The State does not respond to this argument. The transcript reveals confusion by the court on this issue. At that point in its ruling, the court seemed to be saying that Officer Weider saw the butt of the handgun *before* he searched Scott's right front pants pocket – which is factually incorrect – and that gave him probable cause or reasonable suspicion to search the pocket. The court did not provide any other reason to support that aspect of its ruling. The court made clear, however, that it was relying equally on voluntary consent to search in denying the motion to suppress. Accordingly, we are confining our opinion to the consent issue.

[20]The Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The Supreme Court has allowed that traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer v. McCarty*, 468 U.S. 420, 439 n. 29 (1984).

When a vehicle lawfully is stopped for a traffic violation, the driver and any passengers are "seized," *i.e.*, detained, for the duration of the traffic stop. *Brendlin v. California*, 551 U.S. 249, 255 (2007) ("everyone in the vehicle" is seized during a lawful investigatory traffic stop).[21] The permitted stop of the vehicle (and associated lawful detention of its occupants) allows the police "to enforce the laws of the roadway, and ordinarily to investigate the manner of driving with the intent to issue a citation or warning." *Ferris v. State*, 355 Md. 356, 372 (1999). Such a stop is temporary as it must "last no longer than is necessary to effectuate [its] purpose[.]" *Florida v. Royer*, 460 U.S. 491, 500 (1983).

As the Supreme Court also has recognized, traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). Due to this safety concern, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment[.]" *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977). For the same reason, police officers making a traffic stop may order passengers

---

[21]In *Brendlin*, the Court stated that, during the traffic stop, "any reasonable passenger would have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." 551 U.S. 249, 257 (2007) (citations omitted).

in the vehicle to get out. *Maryland v. Wilson*, 519 U.S. 408, 410, 413 (1997) (commenting that traffic stops with passengers pose a greater danger to police officers than traffic stops without them).

We pause in our discussion of the law to state that it is undisputed that the traffic stop of the minivan was lawful. Sergeant Sheehan's calibrations created probable cause to believe Dicks was violating the law by driving above the posted speed limit. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (noting that ordinarily a traffic stop is an investigatory *Terry* stop for which only reasonable articulable suspicion is required but when the police have witnessed the traffic violation, probable cause exits). There was Fourth Amendment justification for the police to stop the minivan, and Scott offers no argument to the contrary.[22] Our inquiry focuses, then, on whether the suppression court erred in concluding that during the lawful traffic stop of a vehicle in which he was a passenger, Scott gave the police valid consent to search his pocket.[23]

---

[22]To be sure, this was a pretextual stop, as the police were hoping to find Andre Stevenson in the minivan so they could arrest him under the outstanding warrant. Because there otherwise was legal justification for the stop, it was permissible, under *Whren v. United States*, 517 U.S. 806 (1996).

[23]Likewise, this case does not raise the question, often necessary to address in consent to search cases, whether Scott was seized/detained by the police and if so whether the seizure was lawful. In *Florida v. Bostick*, 501 U.S. 429, 437 (1991), the Supreme Court addressed the "crucial test" for determining whether a person has been seized, *i.e.*, that, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). As the Court explained in *Bostick*, however, consent may be given voluntarily by a person who is being detained and does not feel

(Continued…)

Consent to search is a well-established exception to the warrant/probable cause requirement of the Fourth Amendment. *Gamble v. State*, 318 Md. 120, 123 (1989) ("'one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent'" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)); *see also Katz v. United States*, 389 U.S. 347, 358 n.22 (1967) (a search authorized by consent is valid). Consent may be given expressly or impliedly, "by conduct or gesture." *Turner v. State*, 133 Md. App. 192, 207 (2000). Significantly for our purposes, "[f]or consent to be effective, it must have been freely and voluntarily given[.]" *Id.* at 202. It is the State's burden to prove, by a preponderance of the evidence, that the consent to search was voluntary. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980); *McMillian*, 325 Md. at 284-85.

As our Court of Appeals observed in *Scott v. State*, 366 Md. 121, 140 (2001), in *Schneckloth* the Supreme Court laid down the "ground rules" for determining the Fourth Amendment validity of a consent to search.[24] The Supreme Court held that "whether a

_____

(…continued)

free to leave. The question in that sort of situation is "whether a reasonable person would have felt free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 436.

[24]The ground rules in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), govern when, at the time consent to search is requested, the subject either was not being detained under the Fourth Amendment or was being detained legally. If the subject was being detained unlawfully, "the ostensible consent would be the tainted fruit of the Fourth Amendment violation" unless the taint was shown to have been attenuated. *Graham v. State*, 146 Md. App. 327, 351, 370-71 (2002); *see infra* at n. 34.

consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227. Assessing voluntariness therefore requires "analyzing all the circumstances of [the] individual consent" and "careful sifting of the unique facts and circumstances of each case[.]" *Id.* at 233. The meaning of voluntariness in this context must accommodate two competing concerns: "the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Id.* at 227.

The *Scott* Court held that the defendant, one of the occupants of a motel room when the police conducted a knock and talk operation, was not seized (which, had there been a seizure, would have been illegal absent attenuation) and, applying the *Schneckloth* test, consented voluntarily to a search of the room.[25] It included among the factors relevant to voluntariness "the number of officers present, the age, maturity, intelligence, and experience of the consenting party, the officers' conduct and other circumstances under which the consent was given, and the duration, location and time of the encounter." 366 Md. at 142. The Court pointed out that these factors are akin to those relevant to whether an interaction between a police officer and an individual after a traffic stop has

---

[25]In a "knock and talk" operation, police officers approach a dwelling in a crime ridden area, without a warrant or probable cause, knock on the door, identify themselves, and ask permission to enter to pose questions about unlawful activity in the area. If allowed to enter, they eventually ask for permission to search the premises. *Scott v. State,* 366 Md. 121, 139-40 (2001).

ended is a consensual encounter (which does not implicate the Fourth Amendment) or a seizure (which does). *Id*. at 142 (citing *Ferris*, 355 Md. at 377).

In *State v. Green*, 375 Md. 595 (2003), the Court applied those same factors in holding that a driver voluntarily consented to a police search of his vehicle after a traffic stop had ended. It explained that factors potentially relevant to whether a police officer obtained a voluntary consent to search from the subject "or induced [the subject's] cooperation by coercive means" include:

> "the time and place of the encounter, the number of officers present and whether they were uniformed, whether the police removed the person to a different location or isolated him or her from others, whether the person was informed that he or she was free to leave, whether the police indicated that the person was suspected of a crime, whether the police retained the person's documents, and whether the police exhibited threatening behavior or physical contact that would suggest to a reasonable person that he or she was not free to leave."

*Id.* at 613-614 (quoting *Ferris*, 355 Md. at 377); *see also United States v. Robertson*, 736 F.3d 677, 680 (4th Cir. 2013) (listing similar relevant factors).

As the *Green* Court recognized, "one factor to be taken into account" in deciding voluntariness is whether the subject knew he had the right to refuse to give consent. 375 Md. at 227. Supreme Court jurisprudence is clear that an individual may give voluntary consent to a search without knowing he has the right to withhold consent. *Schneckloth*, 412 U.S. at 234 ("[K]knowledge of [the] right to refuse [consent] is not a prerequisite of a voluntary consent."); *see also United States v. Drayton*, 536 U.S. 194, 206 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless

consent search."). An individual's lack of knowledge that he could withhold consent to a police search of his car "may be a factor in the overall judgment, [but] is not to be given controlling significance." *United States v. Watson*, 423 U.S. 411, 424 (1976).

Likewise, the fact that a person is being temporarily detained by the police when he gives consent to search is one factor in the total circumstances and is not determinative of voluntariness. In *Collins v. State*, 376 Md. 359 (2003), the Court made clear:

> A person temporarily detained in a *Terry* stop may validly consent to a search of his person, papers, or effects, and that presupposes that it is permissible for an officer to seek such consent.

*Id*. at 372-73 (citations omitted); *see also Jones v. State*, 407 Md. 33, 50 (2008) (whether the defendant was seized is a factor to be considered under the totality of the circumstances in assessing whether consent was voluntarily given).[26] Indeed, the Supreme Court and our Court of Appeals have held that a person under arrest or in custody – a greater restriction on freedom than being temporarily detained – may voluntarily consent to a search.[27] *United States v. Watson*, 423 U.S. at 424 (in holding

---

[26]In his reply brief, Scott quotes *United States v. Olivares-Campos*, 276 F. App'x 816, 824 (10th Cir. 2008) (Gorsuch, J.), as saying, "[T]he fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual." That is only a portion of the quoted sentence, however. The full sentence reads, "Although the fact that one is detained during an investigation no doubt implies an atmosphere not altogether consensual, our precedent firmly instructs us that the fact of an investigative detention, standing alone, is not so coercive as to render the consent of all detained persons involuntary." *Id*. at 824. In that case, the court held that the defendant's consent to a search given while he was detained was voluntary.

[27]An investigative *Terry* stop is "a lesser Fourth Amendment intrusion than a full-scale arrest." *Pyon v. State*, 222 Md. App. 412, 420 (2015).

that an individual legally arrested on the street validly consented to the search of his parked vehicle, the Court stated: "[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."); *Miles v. State*, 365 Md. 488, 530 (2001)("a person in custody may still give valid consent to a search").

Just as the Supreme Court did in *Schneckloth*, federal courts addressing factors that may have a bearing on the voluntariness of consent to search often categorize them as individual or environmental. For example, in *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990), the court identified the subject's age, general intelligence, education, whether he was intoxicated or under the influence of drugs, whether he was told he could refuse to consent, and whether, due to prior encounters with the law, he was aware of that right, as individual characteristics that may be relevant to voluntariness. It included among the environmental factors that might be pertinent whether the subject was detained, whether he was questioned for a long or short period of time, whether he was threatened, physically intimidated, or punished by the police, whether he relied upon promises or misrepresentations by the police, whether he was in custody or under arrest, whether he was in a public or secluded place when consent was sought, and whether he objected to the search as it was carried out. *Id*.; *see also United States v. Boone*, 245 F.3d 352, 361-62 (4th Cir. 2001) (factors relevant to voluntariness of consent to search include characteristics of the accused – for example age, maturity, education, intelligence, experience – and conditions under which consent was obtained – for example officers' conduct, number of officers, duration of encounter, whether the accused knew of his right to refuse consent.)

Other factors courts have considered relevant to voluntariness are whether the police conduct involved "threat, trickery, force, [or] false reliance on a warrant," *Gamble*, 318 Md. at 127; *see e.g. Bumper v. North Carolina*, 391 U.S. 543, 547-48 (1968) (police obtained consent to search house by pretending they had a search warrant); whether the police spoke in an aggressive or insistent tone so as to convey to the subject that consent was required, *see United States v. Arzeta*, 602 F.3d 1208, 1215 (10th Cir. 2010); a threatening presence of several police officers, *see United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006); and whether the police had their weapons holstered, *see Drayton*, 536 U.S. at 205 ("The presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon.") and *United States v. Chaney*, 647 F.3d 401, 407-08 (1st Cir. 2011) (consent to search was voluntary even when officers entered motel room in which defendant was located with guns drawn).

We return to the case at hand. The suppression court found that Scott gave consent to Officer Weider to search his right front pants pocket. Specifically, in response to Officer Weider's asking, "May I reach into your pocket….?," Scott said "yes" and nodded his head affirmatively. As this finding was supported by competent and material evidence in the record – the body camera videos and Officer Weider's testimony – it was not clearly erroneous. *YIVO Inst. for Jewish Research v. Zaleski*, 386 Md. 654, 663 (2005) (a trial court's factual findings cannot be clearly erroneous if there is "any competent material evidence" in the record to support them). Scott does not argue seriously that the finding was clearly erroneous.

Scott maintains, however, that a "cluster of coercive factors" induced him to give in to Officer Weider's request to search without voluntarily consenting to it. *See Pyon v. State*, 222 Md. App. 412, 456 (2015) (mere acquiescence in an officer's request "is by no means the same as voluntary consent"). He points to the following as having created a coercive environment: 1) the police ordered him out of the minivan; 2) after he got out of the minivan, they restricted and controlled his movements, through physical touching, leading the suppression court to find a separate, unlawful "detention"; 3) several officers were present; 4) the police ignored his repeated complaints of feeling ill; 5) Officer Weider "stood over him and established control over the pocket he sought to search, telling [him] to stop reaching inside it"; and 6) immediately thereafter, Officer Weider asked to search his front right pants pocket, making the request in the same "flat authoritative tone" as the directive to stop grabbing his pocket. Scott argues: "Having been subjected to these orders and further demonstrations of police authority, no reasonable person would have felt free to refuse Officer Weider's final request because he purported to phrase it in the form of a question."[28]

For the first thirteen minutes of the traffic stop, Scott, Dicks, and Kidwell sat in the minivan. They were told to get out when the K-9 unit arrived, to protect them from being bitten during the search. Recognizing this, the suppression judge stated, in ruling:

> You wouldn't want individuals in a car where the canine was going to be. That makes common sense. And moreover, the officers are allowed to, in a

---

[28]Scott does not elaborate on "further demonstrations of police authority" that would have created a coercive environment.

traffic stop, it's a legitimate traffic stop, and the officers can ask people to exit the vehicle.

There was nothing overbearing about how the police directed the occupants of the minivan to get out of it, and they did so in accordance with police policy, for the occupants' safety. It would have been dangerous for the police to do otherwise. Also, the canine search would have lacked integrity if the occupants were in or near the minivan during the search.

Scott is wrong that the court found he was subjected to a second, unsupported, detention when he was ordered out of the minivan and guided by Officer Serlo to a location to sit or stand. Scott's counsel made that argument to the suppression court, unsuccessfully. In his ruling, the judge, citing *Maryland v. Wilson,* 519 U.S. at 410, and *Arizona v. Johnson,* 555 U.S. at 323, explained that under Supreme Court law the occupants of a vehicle stopped for a traffic violation are detained for the duration of the stop. The judge did *not* find that by ordering Scott out of the minivan and guiding him where to go, the police subjected him to an additional, separate detention (not supported by reasonable suspicion or probable cause) over and above the temporary detention of being a passenger in a traffic stop. On the contrary, the judge factored into his ruling that, as a passenger in the minivan, Scott was detained until the purpose of the traffic stop was fulfilled, as any passenger would be.

As recounted above, the officers who interacted with Scott before the search of his pocket noticed that he was hunching over and that when he walked his movements were unsteady. It was only because Scott walked from the minivan to the nearest curb of the

median strip, too close to the minivan for the scan to be performed properly, that Officer Serlo told him he had to move. Officer Serlo explained that he held on to the back of Scott's shirt when guiding him to the appropriate location to sit or stand to prevent him from falling down. The judge made a specific finding that Officer Serlo did not "grab" or "hold" Scott when guiding him and that Scott was being guided so he would not wind up in traffic. The traffic stop was in the fast lane of a busy area of Frederick Road, during afternoon rush hour, and Scott was stumbling. As the court put it, "I think it would be crazy for police to allow somebody to walk around in the middle of traffic, a dangerous situation like that ...." These findings, and the finding that this interaction was non-confrontational, were amply supported by the evidence, including the body camera footage. Officer Serlo acted protectively, not threateningly, by guiding Scott away from the minivan, where the canine scan would be performed, to a safe place to sit or stand in a way that would keep him from entering rush hour traffic until he got there.[29]

Nor does the record bear out Scott's assertion that the officers ignored his complaints of feeling unwell. While sitting in the minivan, Scott said the heat was bothering him. When he got out of the minivan, Sergeant Sheehan asked him if something was wrong, but he did not respond. Scott then told Officer Weider he did not feel well. When Officer Weider inquired why, Scott complained he was hot and had not eaten. Scott's only physical complaints throughout the stop were of feeling hot and being

---

[29]Officer Serlo's act of guiding Scott to an appropriate place to sit or stand was brief – less than half a minute.

hungry. Given that the outside temperature was in the nineties and Scott had been in the minivan with the air conditioning off for fourteen minutes, there was nothing unusual about his feeling hot. Officer Serlo helped him by suggesting a place on the curb for him to sit that would not be as hot as it was away from the car engines.[30], [31]

Not including the K-9 unit officer, who was not near any of the occupants of the minivan, five police officers were present at the traffic stop. Except for at the very beginning of the stop, and until the canine alerted (after the handgun was found), Officer Weill was inside his police cruiser and did not interact with Scott (or with Dicks or Kidwell). Scott's interactions with Officers Serlo and Zotti while he was sitting in the minivan were benign, as was his interaction with Sergeant Sheehan. Later, when Scott was sitting on the curb, he only interacted with Officer Weider. Officer Serlo was standing between Scott and Dicks, Officer Zotti was standing farther down the median strip, near Kidwell, and Sergeant Sheehan was participating in the vehicle search.

---

[30]Given that before the handgun was found, Scott had been complaining about feeling sick, and that after it was found, he stood up straight and stopped complaining, it would not be unreasonable to conclude that he was feigning illness to conceal his weapon. That would tend to show that he had self-control and was not being cowed by the police. The court did not make any finding about whether Scott was feigning illness, however.

[31]Scott cites *State v. Oltmanns*, 519 N.W.2d 602, 604 (S.D. 1994), where evidence that the defendant "was feeling ill and weak" contributed to the court's determination that his consent to give a statement to the police was not voluntary. *Oltmanns* is not comparable. The defendant had cerebral palsy, an organic mental disorder, and borderline intellectual functioning. Most significantly, when the police interrogated him and asked him to consent to giving a statement, in addition to those conditions he was suffering from the physical and mental effects of carbon monoxide poisoning.

None of the five officers involved in the traffic stop acted in a threatening or hostile manner at any time. The interactions between the occupants of the minivan and the police were innocuous. The officers did not speak loudly, were not rude, and did not accuse any of the occupants of having committed a crime. The police did not question Scott at all. The suppression court not only found that the atmosphere of the stop was non-confrontational but also found from Scott's behavior as shown on the body camera videos that he was not nervous and did not seem "bothered" by the presence of the officers. Given the non-threatening conduct of the officers and that Officer Weider was the only officer interacting with Scott when he sought consent to search Scott's pocket, the fact that five officers were present at the stop did not make for a coercive environment.

The last two events Scott maintains led him to acquiesce in the request to search are that Officer Weider "stood over him and established control over the pocket he sought to search, telling [him] to stop reaching inside it" and then, in the same "flat authoritative tone[,]" asked to search his front right pants pocket.

When Scott reached the area on the median strip far enough away from the minivan, he chose to sit on the curb, perhaps, as Officer Serlo suggested, because it was not as hot there. He could have remained standing (as Dicks did). Officer Weider already was standing on the median strip next to where Scott sat down. Officer Weider did not place himself in a physical position above Scott; Scott sat on the ground near his feet.

Officer Weider did not ask to pat down Scott or to search him generally.[32] He

made a focused request to search Scott's right front pants pocket. Nor was that request

[32]Scott cites *Graham*, 146 Md. App. 327, for the proposition that consent to a pat down never can be given voluntarily during a roadside traffic stop and suggests the same holds true for a search like the one here. That is not the holding in *Graham* and the case otherwise is inapposite. In *Graham*, we held that the pat down of the defendant was not supported by reasonable articulable suspicion and, given the complete absence of evidence that the police officer asked the defendant for consent to perform a pat down or that the defendant had given consent to a pat down, we further rejected the State's last-ditch argument that the pat down was by consent. Before holding that there was no evidence of consent, we remarked, in an aside, that the State had not cited any cases, "and we know of none, in which the consent to a request to be frisked has been deemed to be an act of voluntary consent rather than submission to a 'show of authority.' The very phrase 'consensual frisk' borders on being an oxymoron." *Id*. at 368.

Whether a pat down can be consented to during a traffic stop was not an issue in *Graham*, as consent was never sought or given. And, in the case at bar, Officer Weider did not seek consent to perform a pat down of Scott but made a specific request for consent to search Scott's right front pants pocket. More to the point, however, there *are* cases holding that an individual can consent voluntarily to a pat down during a traffic stop. In *United States v. Chhien*, 266 F.3d 1, 7-8 (1st Cir. 2001), after the defendant/driver was stopped for tailgating and tinted headlights, a police officer asked him for consent to perform a pat down. He gave consent and the pat down revealed a large bulge in his pocket, which he claimed was $2,000. The pat down led to additional questioning of the defendant and his passenger, however, and ultimately to the discovery of cocaine in the front seat of the vehicle. The First Circuit upheld the suppression court's ruling that the consent to the pat down was voluntary. Even though the officer still had the defendant's documents and the defendant was not told he could refuse consent, there was no evidence that he was "tricked, threatened, or bullied" into giving consent; and the situation was not "inherently coercive" as it was "broad daylight" on a major thoroughfare, the officer's gun was holstered, and there was only one officer present. *Id*. at 7-8; *Cf. People v. Berdahl,* 440 P.3d 437, 443-44 (Col. 2019) (defendant voluntarily consented to pat down by police officer before accepting a courtesy ride from him after his car broke down, stranding him); *State v. Brockel*, 746 N.W.2d 423, 427 (N.D. 2008) (holding that "[e]ither reasonable suspicion or voluntary consent needs to be present to justify a pat-down search" and remanding for the suppression court to determine if either was present); *Franklin v. State*, 378 S.W.3d 296, 301-02 (Ark. Ct.

(Continued…)

randomly made. Soon after Scott sat down on the curb of the median strip, Officer Weider noticed a bulge in his pocket and that he was trying to grab at it. Officer Weider expressed concern about the grabbing, said he didn't want Scott to do that, and asked, "May I reach into your pocket and get it?" Officer Weider did not yell at Scott, raise his voice, phrase his question as a command, or use a tone of voice or inflection communicating that compliance was required. He did not speak or act aggressively or with hostility. He said nothing untrue, misleading, deceptive, or improper.

When Officer Weider posed the question, he bent down to speak to Scott, who was sitting at his feet. From the way Officer Weider posed the question, it was clear that his main concern was Scott's grabbing at his pocket, something Scott simply could have stopped doing. In addition, Scott knew that his handgun was not in the pocket Officer Weider was focused on and that he requested consent to search. The pocket contained money, a pack of cigarettes, and over the counter medicine. Knowing that the gun was in his waistband and not in his pocket, it made sense for Scott to allow Officer Weider to reach into that pocket.

In the context of the generally non-confrontational atmosphere of the traffic stop, the suppression court found Officer Weider's request for consent to reach in Scott's pocket unimposing: "[T]his was a very straight forward, hey can I go in your pocket.

(…continued)
App. 2010) (holding that defendant voluntarily consented to police officer patting him down for weapons).

And it was a yes." The court's assessment of the atmosphere surrounding the request for consent was not clearly erroneous.

As *Schneckloth* requires, the total circumstances of the traffic stop must be assessed in determining whether consent was voluntarily given. 412 U.S. at 227. The central facts as found by the suppression hearing judge were supported by the evidence, and most of the facts were undisputed. The traffic stop took place on the side of a major road in a populated area in daylight and clear weather, in full view of rush hour traffic. This was not an environment ordinarily conducive to intimidation. *See United States v. Silva-Arzeta*, 602 F.3d 1208, 1215 (10th Cir. 2010) (commenting that a traffic stop made on a public street reduces the possibility of police intimidation). When Officer Weider knocked on the passenger's side window of the minivan, Scott freely interacted with him, providing his identification. Officer Weider returned it in less than a minute. Until the handgun was found, nothing belonging to Scott was taken and kept by the police. *See United States v. Sanchez*, 89 F.3d 715, 718 (10th Cir. 1996) (taking into consideration, in assessing the total circumstances, that the police did not keep any of the defendant's personal effects). The police did not keep anything belonging to Kidwell and they did not even keep Dicks's knives – they returned them to the minivan.

As noted, for the first thirteen minutes of the stop, until Dicks was told to get out of the minivan, Scott, Dicks, and Kidwell sat there together, engaging in friendly small talk with Officers Serlo and Zotti about lottery tickets, hotel charges, houses for sale in Montgomery County, and tattoos. The police did not separate them. They freely interacted with each other in the minivan and remained free to interact after they were

relocated to the median strip. None of the occupants was handcuffed. Dicks was patted down very briefly after acknowledging he was carrying knives and Kidwell was searched by consent after she gave a non-response to why she moved an item to her purse from between her legs. The body camera evidence shows that Scott did not see Kidwell being patted down and that the police were polite with Dicks and Kidwell during the pat downs. Throughout the stop, the officers all had their weapons holstered.

Until Officer Weider saw the bulge in Scott's pocket, there was nothing to suggest that any of the officers were suspicious of him. He was not asked where he had been, where he was going, or why he was traveling with Dicks and Kidwell. The only questions he was asked were generated by his own complaints of not feeling well and of being overcharged for his hotel room. When, after the K-9 unit arrived, Sergeant Sheehan told Scott to get out of the minivan, the sergeant tried to let him know, in a helpful way, that he was about to drop his phone and wallet. After those items fell to the ground, he gave Scott time to pick them up. In short, what little conversation there was between Scott and the police was mundane and entirely inoffensive.

In arguing that he found himself in a coercive environment in which he had no choice but to consent to the request to search, Scott places primary reliance upon *Charity v. State*, 132 Md. App. 598 (2000), which is easily distinguishable.

-30-

A State Trooper stopped Charity's car for tailgating on a cold, rainy night in January, in the dark, on a rural road.[33]   When the trooper, a narcotics investigator, realized that Charity had a passenger and saw a large number of air fresheners hanging from the rear-view mirror, he suspected drug trafficking and called for backup.  He took and kept Charity's driver's license and registration and the passenger's driver's license, ordered Charity out of the vehicle, separated him from the passenger, and questioned him about where he had been and where he was going.  Then, leaving Charity standing in the cold and rain, he returned to the passenger, asked him the same questions, and decided the answers were inconsistent.  Intending to put Charity in his police cruiser to question him more extensively, the trooper asked to perform a pat down.  Charity did not answer verbally but raised his arms in the air.  In the pat down, the trooper felt a bulge in Charity's pants pocket and questioned him about its contents.  In response, Charity pulled out a packet of gum and some cash, inadvertently revealing that he was holding a gram-bag of marijuana.  The trooper searched the automobile and found a large amount of cocaine.  Charity was arrested and transported to the station house.  While his arrest was being processed later that night, the trooper issued him a warning for tailgating.

Charity filed a motion to suppress the cocaine from evidence, which the court denied.  He plead guilty based upon an agreed statement of facts.  On appeal, we reversed.  We held that although the initial traffic stop for tailgating was lawful, it

---

[33]A second car also was stopped but another officer promptly issued a warning and allowed the driver to leave.

quickly became unlawful because the trooper abandoned its purpose. Instead, he detained Charity solely to question him about suspected drug activity, which had "no conceivable relationship" to tailgating and for which the trooper lacked reasonable articulable suspicion for an investigatory stop. *Id.* at 619. Because Charity was being detained *illegally* by the trooper, his consent to the pat down was involuntary as a matter of law.[34] We went on to explain that Charity's consent to the pat down was involuntary under a totality of the circumstances analysis because it was induced by a "cluster of coercive factors," including that it was late at night and raining in a rural area, he was separated from his passenger, he was not advised that he was free to leave, his license and that of his passenger were taken and not returned, and two other officers were present. *Id.* at 638-39 (citing *Ferris*, 335 Md. at 378-79).

The case at bar stands in stark contrast to *Charity*. Scott was lawfully detained as a passenger in a vehicle that was stopped for speeding; the purpose of the stop was not abandoned and still was being carried out when Officer Weider sought consent to search Scott's pocket; unlike the illegal seizure in *Charity* which, having changed purpose, no longer had any foreseeable ending point, the seizure here remained one of expected limited duration; the traffic stop here took place next to the median strip of a heavily

_____

[34]When a subject is seized illegally, his consent to a search only will be voluntary, instead of being given in acquiescence to a show of authority, if the consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion.'" *McMillian v. State*, 325 Md. at 288-89 (1992) (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963) (footnote omitted)). As there was no such evidence, Charity's "consent" to the pat down was involuntary.

traveled road during the day, in rush hour traffic, and in good weather, not in a secluded

and sparsely populated area in the dark and rain; the occupants of the minivan were not

separated and Scott was not questioned about potential criminal activity; and the

passengers' identification documents were not withheld by the police.    As the

suppression judge found, and as is supported by the body camera evidence, the police

interactions with the occupants were non-confrontational.[35]

For Fourth Amendment context, in addition to *United States v. Chhien*, 266 F.3d 1

(1ˢᵗ Cir. 2001), discussed *supra* at n. 32, the following is a sampling of traffic stop cases

presenting circumstances similar to those present here, in which courts found the

defendant's consent to search voluntary:

- *United States v. Castillo Palacio*, 427 F. Supp. 3d 662 (D. Md. 2019): The police
  stopped a minivan in daylight in a busy area for driving through a stop sign.  The
  minivan had five occupants.  Four officers were involved in the stop.  The driver
  was arrested on a warrant and was searched.  The defendant, a passenger in the

---

[35]With respect to out-of-state cases, in addition to citing *United States v. Olivares-Campos*, *supra*, which as explained above is not supportive, Scott quotes the following language from *State v. Pichardo*, 623 S.E.2d 840, 849 (S.C. App. 2005): "A traffic stop, or pre-existing seizure, enhances the coercive nature of the situation and the efficacy of the other factors in pointing to the restriction of liberty."  *Pichardo* is inapposite.  The court made that remark in the context of determining that the continued questioning of the driver and passenger of a vehicle that had been stopped for a traffic violation, after the traffic stop had ended, was a second seizure that was not supported by probable cause or reasonable articulable suspicion.  The suppression court had held that it was a second seizure; that the detention of the driver and owner was illegal; and, most important, that neither had consented to the search of the vehicle because the owner did not understand English, so did not know he was being asked to consent, and the other occupant had said he could not give consent for the owner.  The appellate court affirmed the granting of the motion to suppress.

Scott also cites two Iowa cases that we shall comment upon in the next section.

back seat, was acting nervous and appeared to be distancing himself from a backpack that had been on the floor of the minivan near his feet. In response to police questioning, he acknowledged the backpack was his and consented to the police searching it. The police did not tell him he could refuse consent. The police had their guns holstered. Illegal ammunition was found in the backpack. The district court found that no coercion was used and that considering the total circumstances, the defendant voluntarily consented to the search of the backpack.

- *Basnueva v. United States*, 874 A.2d 363 (D.C. 2005): A vehicle was stopped by the police on a public street during the day because the driver and passenger (the defendant) were not wearing seat belts. Three officers were involved. In the defendant's presence, the driver was taken into custody and searched because he did not have a driver's license. Two officers then questioned the defendant about whether he had any drugs or guns. He answered no. One officer asked for consent to search him, and he gave permission. There was no evidence that he was told he could refuse consent. The search revealed drugs on his person. Upholding the lower court's ruling that the consent to search was voluntary, the appellate court concluded, given the location and time of the stop, that the police only asked the defendant a few questions, that the driver had been arrested peaceably and there was no reason for the defendant to think he also would be arrested, that the defendant was sitting unrestrained in the car, that there was no evidence he was in a vulnerable state, and that the police did not use fear or intimidation, the consent was voluntary under the total circumstances.

- *United States v. Chaidez*, 906 F.2d at 377: The defendant was stopped for speeding on a public highway during the day. He was questioned about where he had been and where he was going and gave answers that did not hold together. The officer had him sit in the police cruiser. While there, he was questioned briefly and was asked whether he would agree to a search of his car. He said yes. He was not under the influence of drugs or alcohol. He was not told that he could refuse to give consent. He cooperated in the search by opening the trunk of the car. He had some familiarity with the legal system as he had been convicted of drug possession in the past. There were no threats or promises made. Under the total circumstances test, the setting was not "unduly coercive" and the consent to search was voluntary. *Id.* at 382.

- *United States v. Velasquez*, 885 F.2d 1076 (3rd Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990): In the daytime and on a major highway, the defendant driver, accompanied by a male passenger, was stopped for speeding. The officer directed her to get out of the car and questioned her about where she was going and who owned the car (which was registered to a third party). The officer then questioned the passenger separately and received inconsistent answers. He had the defendant sit in the cruiser with him because it was warmer and less noisy there. While in

the cruiser, he asked for permission to search the car. He did not inform her that she could refuse. She gave verbal assent and then signed a consent form. The officer ordered the passenger out of the vehicle. The search of the car revealed a false compartment, later determined to hold a large amount of cocaine. On appeal, the Third Circuit "perceive[d] no coercion or overreaching" and concluded that the consent to search was voluntary. *Id*. at 1082.

- *United States v. Soto*, 988 F.2d 1548 (10th Cir. 1993): The defendant driver was stopped for speeding in the daytime, on a major highway, in the cold. A woman and child were passengers in the vehicle. The officer, who was alone, took the defendant's license and registration and asked him whether he was carrying drugs or weapons. The defendant answered no. Before the officer issued the citation and returned the documents, he again asked whether the defendant was transporting drugs or weapons. When the defendant again answered no, the officer asked permission to search the trunk of the car. The defendant answered yes and got out of the car and opened the trunk. There was no evidence that the officer told him he could refuse consent. Upon further inspection, a secret compartment containing heroin was found. The district court denied a motion to suppress. The Tenth Circuit determined that the consent to search the trunk was voluntarily given under the totality of the circumstances. The officer did not unholster his weapon, "use an insisting tone or manner," or physically harass the defendant, and the consent was unequivocal and specific. *Id*. at 1558.

In these cases, the request by the police for consent to search was made while the subject, either a passenger or a driver, was lawfully detained during a traffic stop. Therefore, the issue was not whether a reasonable person in the subject's position would have felt free to leave but whether, under the total circumstances that existed, such a person would have felt free to decline the request. None of the subjects was told before consenting that they had the right to refuse consent, although one of them may have been aware of that from prior experience. In some of the cases, the subject of the search was moved at the direction of the police, either to a specific area or into a police cruiser for additional questioning. In all the cases, the subject was questioned about topics related to possible criminal activity, some extensively and some briefly. In two cases, the driver

-35-

was arrested peaceably and searched before the passenger gave consent to search. In all the cases, the stops were made during the day in areas open to public view and the officers acted politely, were not physically aggressive, hostile, or overbearing in their approach, and did not unholster their weapons. The subjects varied in their individual characteristics, which one would expect, but none of them was vulnerable or young. In all the cases the courts sifted through the facts and determined that they weighed in favor of the subject of the search maintaining the free will to decide whether to give consent to search.

Here, when we give deference to the suppression court's non-clearly erroneous factual findings and the reasonable inferences they support, we are left in much the same position as the courts above. The traffic stop was in an open, visible area, the atmosphere was non-confrontational and at times friendly, and the police officers conversed about ordinary topics with Scott and the other occupants of the minivan. For most of the stop, Scott simply was sitting in the minivan. Scott was in his forties and had no apparent disability or intellectual deficiency. The police officers were not hostile or overbearing, did not lie to or deceive Scott, and spent no time questioning him about criminal activity. The officers did not confiscate anything belonging to the occupants – even Dicks's knives. Scott was given help getting out of the minivan and making his way to a safe area on the median strip. From the time Scott got out of the minivan until the handgun was found was less than two minutes.

Scott was lawfully detained as a passenger in a legal traffic stop. Neither of the other occupants of the minivan was arrested in his presence. Kidwell consented to be

searched but the search did not happen in Scott's view. Because the stop was for speeding and Scott was not the driver, he would not have faced charges in connection with the stop. A K-9 unit was called because a previous stop had tied the minivan to drug trafficking by Andre Stevenson. Scott had not been involved in that prior stop, did not own the minivan, and there was nothing to indicate that he had any connection to Stevenson. Scott merely was in a position of waiting until the traffic stop ended.

Officer Weider clearly and calmly asked whether he could reach in Scott's pocket and Scott answered affirmatively both verbally and by nodding. There was nothing threatening or harassing in Officer Weider's conduct or manner. Although Scott was not told he could refuse Officer Weider's request, it was evident that if he had stopped grabbing his pocket Officer Weider's concern would have been allayed. Consistent with the suppression court's finding, Scott did not appear to be bothered by Officer Weider or any of the police officers. In addition, Scott knew that his handgun was not inside the pocket Officer Weider was asking to reach into.

The traffic stop in this case was a legitimate pretextual stop under *Whren v. United States*, 517 U.S. 806 (1996). Hoping to find Andre Stevenson, for whom they had an arrest warrant, the police stopped the minivan upon probable cause to believe the driver had broken the speeding laws. Stevenson was not in the minivan, so the stop proceeded as a traffic violation with a canine sniff, as Stevenson's drug trafficking had been connected to the minivan. The police did not act as if they were suspicious of any of the occupants of the minivan. The first sign of something suspicious – and potentially dangerous – was the bulge around Scott's pocket and his grabbing for it. If Officer

Weider had believed he had more than a hunch that Scott was carrying a handgun – *i.e.*, that he had reasonable suspicion – he would have patted Scott down. Apparently, he did not believe he had reasonable suspicion, so he took the next logical, safety-driven action: asking Scott for permission to search the pocket he was grabbing.

A complete overview of the circumstances reveals a "legitimate need" for a consent to search with "the equally important requirement" that the consent to search was given willingly, not by coercion that overbore Scott's freedom to decide for himself whether to allow Officer Weider to search his pocket. *See Schneckloth*, 412 U.S. at 227. Under the total circumstances, Scott's consent was voluntary.

### *Article 26 of the Maryland Declaration of Rights Analysis*

In his brief, Scott makes the general statement that any consent to search he gave Officer Weider was involuntary under the Fourth Amendment *and* under Article 26 of the Maryland Declaration of Rights. He does not advance a separate argument regarding Article 26, however; nor did he do so below.

In addition, in his reply brief, on the issue of consent he cites two Iowa cases holding that a roadside traffic stop is an "inherently coercive setting." *State v. Pettijohn*, 899 N.W.2d 1, 33 (Iowa 2017); *State v. Pals*, 805 N.W.2d 767, 783 (Iowa 2011). He does not mention that these cases were not decided under the Fourth Amendment but on independent state constitutional grounds, namely section 8 of the Iowa Constitution. And, having made no mention of that, he gives no reason why a similar interpretation should be given to Article 26.

As this issue was not raised below and, in any event, was not sufficiently briefed in this Court to permit our deciding it, it is not appropriate for us to address it. *See Klauenberg v. State*, 355 Md. 528, 552 (1999) ("arguments not presented in a brief or not presented with particularity will not be considered on appeal"); *see also* Md. Rule 8-131(a) (ordinarily an appellate court "will not decide any [non-jurisdictional] issue unless it plainly appears by the record to have been raised in or decided by the trial court").

Even if we were to address the issue, we would not be free to interpret Article 26 in a manner inconsistent with the Fourth Amendment. In *Scott v. State*, the Court of Appeals explained,

> Notwithstanding [Article 26's] lack of textual consistency with the Fourth Amendment, we have consistently construed Article 26 as being *in pari materia* with the Federal provision and have accepted as persuasive the Supreme Court's construction of the Fourth Amendment.

366 Md. at 139 (footnote omitted) (citing *Gadson v. State*, 341 Md. 1 (1995); *Gahan v. State*, 290 Md. 310 (1981)). In *Scott*, the defendant had argued that, in deciding whether he had voluntarily consented to the police searching his motel room, the Court of Appeals should follow the approaches of the courts of New Jersey and Washington regarding consent, adopted under their independent state laws. The Court declined to do so. It stated that those approaches were "diametrically inconsistent with *Schneckloth*, and therefore do[] not represent a correct statement of Federal law governing the Fourth Amendment" and therefore, "under our jurisprudence do[] not . . . constitute a correct

statement of Article 26 . . . which we have held is to be read *in pari materia* with the Fourth Amendment." *Id*. at 145.[36]

As we have discussed, in *Schneckloth,* the Supreme Court held that the voluntariness of consent is to be decided by a totality of the circumstances test that does not categorize roadside traffic stops as "inherently coercive." 412 U.S. at 247-48. In the face of clear Court of Appeals precedent to the contrary, this Court cannot interpret Article 26 in a manner inconsistent with *Schneckloth*.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[36]"*In pari materia*" is a Latin phrase meaning "Upon the same subject." In Richard C. Boldt & Dan Friedman, *Constitutional Incorporation: A Consideration of the Judicial Function in State and Federal Constitutional Interpretation*, 76 Md. L. Rev. 309, 344 n. 193 (2017), the authors point out that that phrase does not always clearly "express the current relationship between the interpretations given to the state and federal constitutions" and recommend that the Maryland appellate courts adopt more precise language when discussing that relationship.